[Crim. No. 4476.   Second Dist., Div. Three.   Dec. 28, 1950.]

THE PEOPLE, Respondent, v. JAMES PATTON KING, JR., et al., Defendants; RICHARD B. HAMILTON, Appellant.

Morris Lavine for Appellant.

Fred N. Howser, Attorney General, Frank Richards, Deputy Attorney General, for Respondent.

WOOD (Parker), J.—Defendants were charged with crimes in six counts as follows: Count 1, the murder of Dorothy Greene; count 2, the murder of Jay Greene; count 3, attempted robbery of Dorothy and Jay Greene; counts 4, 5, and 6, robbery of three other persons. Defendant King pleaded guilty to all said charges and admitted that he was armed with a deadly weapon at the time of the commission of the offenses. Defendant Hamilton waived trial by jury. He was convicted of all said charges, and the murders and robberies were found to be of the first degree. He appeals from the judgment and the sentence. Since there were six judgments, it will be assumed that he appeals from all of them. He makes no contention on appeal with respect to the judgments as to counts 4, 5, and 6,—the robbery counts. He contends that the evidence was not sufficient to support the judgments as to counts 1, 2, and 3,—the counts charging the murder of Dorothy and Jay Greene and the attempt to rob them.

On July 19, 1949, about 9:45 p. m., defendant King entered the grocery store and vegetable market of Dorothy and Jay Greene at 11119 Burbank Boulevard, North Hollywood. A clerk in that store testified that at said time he heard a person say, "Don't do it. I will give it to you"; then the clerk turned around and saw defendant King, with an automatic gun in his hand, standing by Mrs. Greene; King reached over the counter toward the cash register; Mrs. Greene bent down, and then he (clerk) heard a shot; King started to run from the store; then Mr. Greene came from the front of the store, and the clerk heard shots and saw Mr. Greene fall; King went "straight out front."

A customer, who was in the store at that time, testified that he saw King walking back and forth along the counter with a small automatic gun in his hand; Mrs. Greene said, "Don't do it. I will give it to you"; then she walked toward the cash register and said, "There it is, take it"; King said, "I said give it to me"; Mrs. Greene said, "All right, I will give it to you"; as she reached down under the counter, where she kept cash in a metal box, King shot her, and she never came up; then King shot Mr. Greene who was standing with his hands up; and King then left the store.

Mr. and Mrs. Greene died immediately after they were shot by King.

Mr. Smith testified that in the evening of said July 19th he was standing in front of his home at 11145 Burbank Boulevard waiting for his wife who had gone to a nearby ice cream place; while he was standing there he saw two men approach said market and stand on the sidewalk in front of the vegetable rack and look toward the inside of the market; there was a slight difference in their height; that one of the men was King; when Mrs. Smith returned, he and she walked up the driveway at their home and as he was entering the back door he heard a series of shots; and he heard the shots about three minutes after he first noticed the two men.

Mrs. Atwood testified that she lived across the street from the market; on said July 19th, about 9:30 p. m., while she was in her house, she heard someone in that vicinity say, "I am going to let you have"; she went upon the front porch and then heard about five shots; after the shots she saw Mr. Greene fall and saw two fellows running toward a car at the side of the grocery store; one of the men was a little taller than the other one; and the defendants are similar in appearance to the two men who ran when Mr. Greene fell.

Mr. Harner testified that on and prior to July 19th King had some things stored in the garage at his (witness') home; that on July 20, 1949, about 11 a. m., he saw King and defendant Hamilton at his home and at that time King went into the house and Hamilton was in King's automobile.

Officer Bouey testified that on July 20, 1949, he and another officer were patrolling Griffith Park in a police radio car, and they stopped to investigate a parked automobile; he (witness) looked up on a hill and saw defendants standing in a group of trees; immediately after he saw them they (defendants) ran in different directions; then he and the officer who was with him drove up to the water tank and waited; King came

toward them and they asked him where his friend was; King called Hamilton and then Hamilton came up; the defendants were taken to the parked automobile; he (witness) told King that he resembled the radio description of the person who had held up the grocery store in the valley the night before; King said he was not the one; he (witness) asked King if he had a police record, and King replied that he had a record.

Officer Stoner testified that on July 21st he and two other officers and King went to the garage at the home of Mr. Harner; King directed the officers to a canvas sack in which there were a .25 automatic gun, a .38 revolver, a box of .25 shells and some .38 shells; a loaded clip was in the .25 automatic; on July 22nd, about 10:30 a. m., King and five officers went to Griffith Park, and after searching among the trees they found a bottle of gun oil and a clip for a .25 automatic; about 1 p. m. of said day the officers, King and Hamilton, went to the same location in the park, where the gun oil and clip had been found, and King dug up a gun barrel.

Officer Uhde, a ballistics expert, testified that he fitted the gun barrel, which was found in the park, to the .25 automatic gun, which was found in the garage, and he fired test shots from that barrel; he compared the slugs which were taken from the bodies of Mr. and Mrs. Greene with the slugs used in the test shots and found that the slugs from the bodies were fired from that gun barrel; and he examined some empty shells, which were found at the scene of the murders, and found that this gun was used in firing them.

Officer Stoner testified further that on July 22nd he asked Hamilton, in the presence of other officers, what he had done on July 19th; he replied as follows: That he had been with King during the day and at 6:30 p. m. he had called his wife and made arrangements to meet her at the motorcycle races at Carrell's speedway; King had dropped him off on Western Avenue; he took the bus on Western Avenue, and walked from Western to the speedway; he was unable to locate his wife during the races; he left during the last race, hitch-hiked home and was in bed when his wife arrived home at 11:30 p. m. He testified further that on July 23rd Hamilton said that, in going to the motorcycle races, he boarded the Western Avenue bus at Wilshire Boulevard; the main entrance to the speedway was on the east side and the pits were off the north end of the track. He testified that he then told Hamilton that the main entrance to the speedway was on the west side, and that the pits were in the center of the track.

The chief supervisor of the Los Angeles Transit Lines testified that in July, 1949, that company operated a bus south on Western Avenue to Imperial Highway (114th Street), but during that month no bus of that company, or of any company, ran south of Imperial Highway on Western Avenue.

Officer Von Platten testified that on July 22d, in the presence of three other officers, he asked Hamilton what he did on July 19th; Hamilton stated he went job hunting on the morning and afternoon of that day with another man (not King); he left the man early in the evening and after 6:30 called his wife, with whom he had intended to go to the motorcycle races, and told her he would be unable to go with her but that he would take a bus and see her down there; he then boarded a bus at Beverly and Western Avenue; the bus went on Western to 179th or 180th Street where he got off the bus; he then walked about two blocks to Carrell's speedway; he entered the east gate and watched the races until intermission; he then searched for his wife but could not find her; he left the speedway about four races before the last event; he hitch-hiked to Vermont and Beverly Boulevard, and from there he went on a bus to Glendale Boulevard, and from there he went home on a streetcar; he had been in bed at his home about half an hour when his wife arrived home about 11:30 p. m.

Officer Von Platten testified further that about two weeks after July 19th he went on a bus from Beverly Boulevard and Western Avenue to the end of the line at Imperial Highway, which corresponds to 114th Street; there was no bus which went south on Western Avenue from Imperial Highway; then he went in the police car south on Western Avenue to 174th Street, then east on 174th Street to the speedway; and the main gate is on the west side of the stadium.

Officer Von Platten testified further that on July 22nd, about 4 p. m., he and another officer took Hamilton and King to a cell in the Chamber of Commerce Building (old substation of sheriff) in Tujunga; a microphone had been installed in the cell with a wire leading to the office of the Chamber of Commerce building; the wire was connected to a recording machine which had been installed in said office; the machine made recordings on a series of tapes; thereafter (on that day), over a period between three and four hours, conversations had in the cell between the defendants were recorded on the tapes; the tapes were then taken from the machines, inserted in four boxes, each box was "labeled consecutively," and the label was "Hamilton and King 7-22-49, Tujunga" number

1, 2, 3 or 4; and the boxes were then taken by the witness to the valley detective division and placed in a closet.

Mr. Stanton, an employee of the police department, testified that he does all the recording work on confessions and installs dictaphones; he installed the recording system in said cell; he picked up a box of tape labeled "Hamilton and King 7-22-49," at the valley division, and took it to the crime laboratory; there were four tapes (each of which was 30 minutes long) and he transcribed them on two 16-inch discs, so that each side of each disc has on it all that was on one tape; he transcribed the tapes by "playing" each tape back on the original machine that it was made on and by fitting it into a disc recorder; the transcription is a mechanical operation which transforms one to the other exactly, and he did not put any sounds on the disc that were not on the tape and he did not omit from the disc anything that was already recorded on the tape; he heard the tape "played," and after the sound was transferred onto the disc, he heard the disc "played," and they were the same; the sound was erased from the tape; that "our original tapes are returned to stock and used over."

Officer Fuson testified that on July 22, 1949, in the said Chamber of Commerce building, he listened, by the use of earphones, to conversation between King and Hamilton that came directly from a microphone at a time when the conversation was being recorded on a tape recorder; he was able to understand clearly what he heard, and he heard the following conversation: King said, "I thought the gun was o.k. I forgot about the ejection marks." Hamilton said, "Did you take them to the gun." King said, "I thought the gun was o.k. The firing pin had been filed down and the barrel changed." Hamilton said, "Have you told them there were two of us yet?" King said, "I believe I did, Dick. I slipped or said something that I should not have said earlier, and after that I kept referring to it as 'we'." King said, "There are a million guys that look like you and a good lawyer could beat an identification." Hamilton replied, "I wish I had one of those guys here."

Officer Ingham testified that on said July 22nd he listened to conversation of defendants, by use of earphones, while the conversation was being recorded on a recording machine; and he could understand most of the conversation; he heard the following conversation: Hamilton said, "Out at Gardena how far is it from Western to Vermont." King said, "It is about a mile or a little bit more or less." King asked Hamil-

ton if he had walked from Western to Vermont, and Hamilton replied, "No." Hamilton said, "Do you know where Carrell Speedway is?" King replied that it is 179th and Vermont. Hamilton said, "Does the bus go that far?" King said, "No, I don't think it does." Hamilton said, "I have got to have it go that far" or "It better go that far." King said, "I didn't say anything to incriminate you." Hamilton said, "How did they know there was two that night?" King said, "Well, if they had asked me I would have told them that I drove the car."

Officer Von Platten also testified that he listened to conversations of defendants, by use of earphones, while the conversation was being recorded; he heard the following conversation: Hamilton said that on one occasion someone had searched his house thoroughly for a gun and had torn the house up looking for a Mauser. King said that the officers had found the gun, and that it was Paul's brother's gun. (Paul is J. Ratner, hereinafter referred to.) King said that he had told the officers that he had gone to Harner's house and changed the gun barrels. King said that he had already admitted guilt. Hamilton said, "How far down does the Western bus go?" Hamilton said, "I got to have it going that far."

J. Ratner, known as "Paul," testified that on several occasions in the summer of 1949, he let King have his brother's Mauser pistol for a few days; he also got a .25 Colt automatic gun for King in the summer of 1949; he (witness) also had a .38 revolver (People's exhibit herein) in his room; he left his room unlocked most of the time; he was in jail on July 19, 1949, and when he returned to his room that gun was not there.

As above stated, Hamilton was convicted on counts 4, 5 and 6 (three robberies) but he makes no contention on appeal regarding them. Counts 4 and 5 pertain to the robbery of Sam and Lawrence Marino at a liquor store at 13507 Ventura Boulevard at noon on June 23, 1949. Defendants entered the store and King, with a gun in his hand, said to Lawrence, "This is a holdup, give me the money." Then Hamilton pointed a Mauser automatic at Sam and said, "This is a holdup. We want your money." Defendants obtained money from both victims. Count 6 pertains to the robbery of a Mr. Wallack at a market in Burbank about 10 a. m. on June 18, 1949. Defendants entered the store and Hamilton, with an automatic gun in his hand, said to a boy in the store, "Don't move, this is a holdup." King pointed a .25 automatic gun

(People's exhibit) at Mr. Wallack and said, "This is a stick-up. Don't make a move or I will kill you." Hamilton took the money out of one register and King took it out of another register.

As above stated, King pleaded guilty to the six charges herein. For the purpose of showing that Hamilton was engaged in a scheme, plan and conspiracy with King to commit crimes, the district attorney presented evidence pertaining to a robbery which was not charged in the information herein. Mr. Melandri, a clerk in a liquor store, testified that in June, 1949, about 11 p. m., King was in the store with a pistol in his hand; King said, "Get back of the cash register"; Hamilton came in and took money from the cash register; King then ordered Hamilton to look for loot; Hamilton couldn't find anything, and they left the store; he (witness) saw them get in a car and drive away.

The two discs, hereinabove referred to, which purport to be a transcription of the four tape recordings, were offered in evidence by the People. Appellant objected to the offer upon the grounds that no sufficient foundation had been laid, and that the discs were not the best evidence and were hearsay. The objections were overruled and the discs were received in evidence.

Appellant's principal contention is that it was prejudicial error to receive the discs in evidence. As above stated, the original tapes were not produced in court, and the sound had been erased from them. Officer Stanton said, as above mentioned, that original tapes are returned to stock and used over. It appears that the original tape recordings herein were destroyed intentionally. The disc recordings were secondary evidence and, under the circumstances here, they should not have been received in evidence. The evidence was sufficient, however, regardless of the disc recordings, to support the judgments of conviction on the six counts. The evidence established that Hamilton and King conspired together to commit armed robberies. They committed the robberies of Sam Marino, Lawrence Marino, Edward Wallack (counts 4, 5 and 6), and Alexander Melandri in June, 1949. As to counts 1, 2 and 3 (the murderers of Mr. and Mrs. Greene and the attempt to rob them), two men participated in committing those crimes, and one of the men was identified positively as King. There was evidence that Hamilton was similar in appearance to the man who was with King. On the morning of July 20, 1949 (the morning after the murders), Hamilton

and King were together at Mr. Harner's house. Also on that day they were together in Griffith Park, and they ran away when they were observed by police officers. The gun barrel which was used in committing the murders was found in the park near the place from which Hamilton and King ran when the officers saw them together. Hamilton made false statements regarding his whereabouts on the night the murders were committed. ■ The conversation between Hamilton and King in the jail, as related by the officers who heard the conversation by use of earphones, was properly received in evidence. ■ "[A] witness may testify to part of a conversation if that is all that he heard and it appears to be intelligible." (*People* v. *Adamson,* 27 Cal.2d 478, 485 [165 P.2d 3].) It could be inferred from such conversation, as related by the officers, that Hamilton was the man who was with King at the store of Mr. and Mrs. Greene. Whether or not Hamilton was at the store with King was a fact which was necessarily within Hamilton's knowledge. As above stated, there was evidence that Hamilton was similar in appearance to the man who was at the store with King, and the conversation related by the officers indicated that Hamilton was there. ■ The fact that Hamilton did not testify and deny his alleged participation in the attempted robbery of Mr. and Mrs. Greene, which resulted in the murder of them by King, may be considered as tending to indicate the truth of the evidence that he was an accomplice in the commission of those crimes and as indicating that, among the inferences which may reasonably be drawn therefrom, those inferences unfavorable to Hamilton are the more probable. (See *People* v. *Adamson,* 27 Cal.2d 478, 491 [165 P.2d 3].) ■ In view of all the evidence other than the disc recordings, the fact that the trial was without a jury, and the other circumstances above mentioned, it was not prejudicial error to receive the disc recordings in evidence.

The purported appeal from the sentences is dismissed. (See *People* v. *Tallman,* 27 Cal.2d 209, 215 [163 P.2d 857].) The judgments as to all six counts are affirmed.

Shinn, P. J., and Vallée, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied January 25, 1951.