[Crim. No. 4611.   Second Dist., Div. Two.   July 6, 1951.]

THE PEOPLE, Respondent, v. HOYT PORTER et al., Appellants.

Thomas G. Neusom for Appellants.

Edmund G. Brown, Attorney General, and Dan Kaufmann, Deputy Attorney General, for Respondent.

WILSON, J.—By information defendants were charged jointly with the crime of murder. Each pleaded not guilty. After trial by the court without a jury they were found guilty of murder in the first degree and each was sentenced to the state prison for life. Their motion for new trial was denied and they are appealing from the judgment upon the grounds (1) insufficiency of the evidence; (2) the court committed reversible error in admitting re-recordings of a wire recording of a conversation between appellants.

The scene of the assault and robbery which resulted in the death of the victim was a stop of the Pacific Electric Railway line known as Valley Junction in the eastern part of Los Angeles, slightly to the north and east of the General Hospital.

The Ramona Freeway runs easterly of and parallel to the tracks at this point and over it is a pedestrian bridge which on its west end terminates in a cement stairway leading to the rear of the passenger waiting station at Valley Junction and on its easterly end terminates in a stairway which leads up to the Pomeroy Street ramp, which in turn after a few feet intersects the main artery of Soto Street.

About 10 'clock in the evening of May 17, 1949, Richard Castro was on the ramp leading to the passenger bridge and as he started to go down the stairs he heard a thud and saw a man fall flat on his face by the waiting station at Valley Junction. Within a couple of seconds thereafter he saw two men rush from behind the station and search the victim's pockets after which he saw them run toward the tracks, proceed north along the tracks and disappear through some shrubs and brush. The junction was lighted by an overhead light. Castro turned around and ran to a hot dog stand on the corner of Pomeroy and Soto and he and a person from the stand ran back across the pedestrian bridge to the victim. Castro did not see or pass anyone on the bridge. When they reached the scene of the crime they found a police officer there.

The officer had arrived on the Pacific Electric car which stopped at the junction about one or two minutes after 10 p.m. He immediately saw the fallen victim lying on his back a few feet from the passenger station and about 5 or 6 feet from the tracks. There was blood alongside the victim's head. The pocket on the left side of his trousers was out and a watch chain was found approximately a foot from the body.

About 10 o'clock of the same evening two colored men were seen by a boy, one James Krout, running across Soto Street where it is intersected by Wabash Street toward Valley Junction and disappearing from view at the Pomeroy ramp. The boy continued north on Soto to the hot dog stand and saw Castro as he ran to the stand. Neither Castro nor Krout could positively identify as defendants the men they saw although each testified they were similar in appearance.

About 10 minutes after 10 of the same evening one Samuel Sandoval, who knew defendant Porter, saw the two men about five blocks from the scene of the crime coming from the vicinity of Soto Street and walking fast, "sort of trotting." In reply to Sandoval's inquiry as to where they were coming from defendant Porter said they had just "pulled a caper."

On the following day Richard Hirsch saw defendant Porter

and asked him if he had been around Valley Junction that night. Defendant told him he had been there with another man, that he had "pulled a caper down there" and got a gold pocket watch and some change. Porter told Hirsch to keep quiet.

Defendants were held for investigation and later released. At that time each of them admitted he was in the vicinity of Soto and Pomeroy at 10 p.m. on May 17, but stated they went directly home. Each of them denied he had been drinking.

About a year after the crime was committed defendant Porter was advised by an investigating officer that there was evidence connecting him with the crime. Porter stated he would tell the police everything that happened at Valley Junction if he could talk to defendant Deckard. Defendants were brought together and left alone. A wire recording was made of their conversation and the technician who made the recording also listened to the conversation directly through the amplifying equipment. During the conversation Porter indicated to Deckard that they had gone down to Valley Junction after crossing Soto Street to board a car to Watts; the victim was lying there when they arrived; they thought he was drunk and went through his pockets, took a watch and several dollars, changed their minds about going to Watts and went home. Porter asked Deckard if he "wanted to put it that way." Deckard said it would be all right with him and if Porter wanted to do it he would "go for it." Deckard told Porter to do all the talking and Porter assented, admonishing Deckard to listen to every word he told the officers. When the officer returned Porter told the following story: He and Deckard had been at the house of a friend; they had gone from there to a hot dog stand at Soto and Pomeroy Streets about 9:30; from there they had gone down to Brooklyn Avenue and a short time later returned to Soto; he told Deckard they wanted to go to Watts and they had run across the street "the way the guy said" and down the ramp leading to Valley Junction where they saw "this guy lying down"; he was short of money and when he saw the man lying there he got the idea he wanted to search his pockets which he did, obtaining a small coin purse and a pocket watch; the man was lying on his right side with his legs "sort of curled up under him"; he believed the chain broke when he jerked the watch out of the victim's pocket; about this time they saw a streetcar coming from another direction and not wanting to be seen, they ran along the tracks leading north from Valley Junction;

they then proceeded home and on the way met Sandoval. When asked why they wanted to go to Watts Porter stated Deckard was feeling pretty "high" and they just made up their minds to go there; the next day he saw some of his friends and someone called him a murderer; he "went along with the joke," neither affirming nor denying the charge. Both Porter and Deckard stated they had been drinking and that they were "high." Porter admitted disposing of the watch by throwing it in a ditch, later directing the officers to the spot where the police recovered the watch.

Defendants testified in their own behalf. Each of them admitted they were at Valley Junction a little before 10 p.m.; that Porter turned the victim over and took the watch and several dollars and they then ran north along the tracks. Each of them testified, however, that the victim was lying on his back when they first saw him; that they were at the waiting room about one or two minutes. Porter denied he told Sandoval he had "pulled a caper" and also denied he had told the police officers on the day following the assault that they had not been drinking. Defendants admitted committing the robbery but denied committing the assault which resulted in the victim's death. Their explanation as to why they had not told the story sooner was that when the officers told them they had found witnesses who could place them at Valley Junction on the night of the crime it looked bad for them so they decided to admit the theft.

█ Defendants contend "the evidence introduced at the trial was purely circumstantial and not sufficient as a matter of law to establish their guilt beyond a reasonable doubt." Their contentions are that the testimony of Richard Castro was inherently improbable and not entitled to credibility; neither Castro nor Krout was able to identify defendants; Castro testified he was on the ramp going down the stairs leading to the waiting room and heard a thud and saw a man fall; he did not see anyone near the man but saw some men run from behind the waiting room and rifle the victim's pockets; Castro failed to see what caused the thud although he should have been able to see it since the area was well lighted.

While Castro and Krout could not positively identify defendants, each of them testified the men they saw were similar in appearance to defendants. Moreover, the admissions of defendants themselves establish that they were at the scene of the crime and robbed the victim at about the time Castro

heard the thud and saw the man fall. The body lay only about 10 feet from the waiting room. Since it was the thud which attracted Castro's attention it does not necessarily follow that he would have seen the person who struck the blow. Defendants admitted they were at the waiting room a minute or two and Castro testified that within a second or two after he heard the thud and saw the victim fall he saw two men, similar in appearance to defendants, rush from behind the waiting station and rifle the victim's pockets. There is nothing unreasonable or inherently improbable in Castro's testimony.

Defendants assert the evidence establishes only that they had an opportunity to commit the assault, that such evidence can have no weight apart from other circumstances unless it excludes all reasonable opportunity for its commission by another, and standing alone it is insufficient to sustain a conviction, citing *People* v. *Tarbox,* 115 Cal. 57 [46 P. 896].

The evidence goes far beyond establishing that defendants had an opportunity to commit the crime and indeed excludes all reasonable opportunity for its commission by another. Their testimony as well as that of witnesses placed them at the scene of the crime at the time it was committed. No one else was observed on the ramp or the bridge and defendants have not testified to encountering anyone else in the area. At the time of their arrest they denied they had been drinking and made no mention of the fact that they had been at Valley Junction. At the time of trial they admitted they were at Valley Junction at or about the time of the assault and that they robbed the victim; they also asserted they had been drinking and were "pretty high." They denied they told the police officers they had not been drinking and Porter denied telling the witness he had "pulled a caper." False and contradictory statements are evidence of a consciousness of guilt. (*People* v. *Turner,* 86 Cal.App.2d 791, 801 [195 P.2d 809]; *People* v. *Darrow,* 212 Cal. 167, 177 [298 P. 1]; *People* v. *Kittrelle,* 102 Cal.App.2d 149, 158 [227 P.2d 38].)

The trial court could take into consideration the fact that defendant Porter admitted that one of his associates made an accusatory statement and that he failed to deny the accusation and could determine whether under the circumstances in which the statement was made his conduct indicated a consciousness of guilt. (*People* v. *Simmons,* 28 Cal.2d 699, 712-3 [172 P.2d 18].)

In addition to the foregoing, there was defendants' conduct

in refusing to make any statements to the police until they had an opportunity to consult with each other. Wholly aside from the conversation itself, the court could infer, inasmuch as defendants knew there was substantial evidence against them, that they were seeking to devise a defense that was consistent with the evidence they knew the officers had. From the conversation it is obvious Porter was instructing Deckard as to the defense they were to adopt and Deckard agreed to the plan. Inasmuch as Deckard had accompanied him there could be no other reason for his relating what took place. Since they dropped their voices it is also apparent they did not want to be overheard laying their plans.

Defendants maintain that in order to sustain a conviction on circumstantial evidence all the circumstances proved must not only be consistent each with the others but consistent with the hypothesis that the accused is guilty and at the same time inconsistent with the hypothesis of innocence; that where all the circumstances are as compatible with innocence as with guilt, a reasonable doubt of guilt arises. ■ The rule that circumstantial evidence must lead to but one reasonable hypothesis against a defendant before it can be so used, and the requirement that guilt be proved beyond a reasonable doubt, are for application in and are primarily for the concern of the trial court. "An appellate court will not alter or hold unsupported the trial court's findings merely because it might reasonably draw an inference different from one the trial court reasonably drew, or might not be convinced beyond a reasonable doubt that it would have made the same findings." (*People* v. *Kerr,* 37 Cal.2d 11, 15 [229 P.2d 777] ; *People* v. *Huizenga,* 34 Cal.2d 669, 675-6 [213 P.2d 710].) ■ After conviction all intendments are in favor of the judgment and it will not be set aside unless the record clearly shows that upon no hypothesis whatsoever is there sufficient substantial evidence, circumstantial or otherwise, to support the conclusion reached by the trial court. (*People* v. *Lindley,* 26 Cal.2d 780, 791 [161 P.2d 227] ; *People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778]; *People* v. *Kerr, supra*; *People* v. *Kittrelle,* 102 Cal.App.2d 149, 153 [227 P.2d 38] ; *People* v. *Klinkenberg,* 90 Cal.App.2d 608, 626 [204 P.2d 47, 613] ; *People* v. *Schoeller,* 96 Cal.App.2d 55, 60 [214 P.2d 572].)

■ Relying upon the case of *People* v. *King,* 101 Cal. App.2d 500 [225 P.2d 950], defendants contend that the court committed reversible error in admitting the re-recordings of the original wire recording of the conversation between

them. The recordings consist of two reels of wire recording and a disc recording. The original wire recording was of the conversation between defendants in the office of the district attorney. The technician who took the recording re-recorded it on another wire recording for the purpose of eliminating as much as possible the background noises. The disc recording was also taken from the original wire recording and was made for the same purpose as the second wire recording. All three recordings were admitted into evidence. In *People* v. *King, supra,* the original wire recording was intentionally destroyed and was not available at the trial. Objection was made to the introduction into evidence of the re-recordings upon the grounds the discs were not the best evidence and were hearsay. The court held they were secondary evidence and under the circumstances should not have been received in evidence. In the instant case no such objection was raised in the trial court and it cannot therefore be raised for the first time on appeal. (*People* v. *Wignall,* 125 Cal.App. 465, 474 [13 P.2d 995] ; *People* v. *Sellas,* 114 Cal.App. 367, 378 [300 P. 150].) ▆ Appellants are deemed to have waived all grounds of objection not stated by them. ▆ The objection raised by defendants in the trial court was that the recordings did not reflect the entire conversation that took place. Such objection is without merit since a witness may testify to part of a conversation if that is all he heard and it appears to be intelligible. (*People* v. *Adamson,* 27 Cal.2d 478, 485 [165 P.2d 3] ; *People* v. *Tarbox,* 115 Cal. 57, 64 [46 P. 896].)

Judgments affirmed.

Moore, P. J., and McComb, J., concurred.