THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* AARON FELD, Appellant.

Argued December 4, 1952; decided May 28, 1953.

*John J. Mooney, Moses Polakoff* and *Robert J. Fitzsimmons* for appellant. I. The court committed prejudicial and reversible error in permitting the District Attorney in his opening and in his examination of the first important People's witness, Michaelson, to describe to the jury the operations of a wire room in Inwood, Long Island, and the connection therewith of Karp and Gross. (*People* v. *Nitzberg,* 287 N. Y. 183; *People* v. *Harris,* 209 N. Y. 70.) II. The court committed error in permitting the District Attorney to offer in evidence phonograph recordings of a tapped telephone conversation between Karp and Michaelson, and Michaelson and Gross. (*People* v. *Katz,* 209 N. Y. 311; *Robb* v. *Hackley,* 23 Wend. 50; *People* v. *Singer,* 300 N. Y. 120; *People* v. *Edwards,* 282 N. Y. 413; *Moore* v. *Leventhal,* 303 N. Y. 534; *People* v. *Jung Hing,* 212 N. Y. 393; *People* v. *Van Arsdale,* 264 App. Div. 300; *Platner* v. *Platner,* 78 N. Y. 90; *People* v. *Flaherty,* 162 N. Y. 532; *People* v. *Fay,* 270 App. Div. 261, 296 N. Y. 510.) III. Apart from the general inadmissibility of the wire-tapped records as violative of the hearsay rule, error was committed in permitting the records of the conversations between Karp and Michaelson and Gross into evidence without proper foundation having been laid therefor. (*Mankes* v. *Fishman,* 163 App. Div. 789; *People* v. *McDonald,* 177 App. Div. 806.) IV. The court erred in permitting into evidence sixteen transcripts of the wire-tapped conversations which were made some time prior to the trial by a stenographer for the District Attorney. (*People* v. *King,* 101 Cal. App. 2d 500; *People* v. *Betts,* 272 App. Div. 737; *People* v. *Del Vermo,* 192 N. Y. 470.) V. The court committed error in refusing to permit the chief inspector of the New York City Police Department to testify whether Feld's name was mentioned on the records. (*Dubois* v. *Baker,* 30 N. Y. 355.) VI. The court committed error in permitting the District Attorney to adduce that the principal prosecution witness had identified defendant as the police officer with whom he arranged a " stand-in " arrest. VII. The court committed error in permitting an inflammatory summation by the District Attorney. (*People* v. *Tassiello,* 300 N. Y. 425; *People* v. *Fielding,* 158 N. Y. 542.) VIII. The court erred in its charge to the jury in that it erroneously commented upon the wire-tap evidence and

improperly and insufficiently delineated for the jury the elements of the law of perjury in the first degree. (*People* v. *Katz,* 209 N. Y. 311.) IX. The People failed to prove that the testimony alleged to be perjurious was material to the investigation or matters before the Grand Jury and, therefore, the crime of perjury in the first degree was not established. (*People* v. *McDermott,* 267 App. Div. 968; *People* v. *Barbuti,* 207 App. Div. 285.) X. The indictment is based on illegal evidence. (*People* v. *Glen,* 64 App. Div. 167, 173 N. Y. 395; *People* v. *Walsh,* 92 Misc. 573; *People* v. *Nitzberg,* 289 N. Y. 523.) XI. The wiretap evidence was improperly obtained on an invalid court order. (*Gilbert* v. *York,* 111 N. Y. 544; *Frees* v. *Ford,* 6 N. Y. 176; *People* v. *Pisarzek,* 178 Misc. 641; *People* v. *Defore,* 242 N. Y. 13; *People* v. *Richter's Jewelers,* 265 App. Div. 767, 291 N. Y. 161.) XII. The indictment was defective. (*People* v. *Gillette,* 126 App. Div. 665.)

*Miles F. McDonald, District Attorney* (*Aaron E. Koota* and *Julius Helfand* of counsel), for respondent. I. The testimony of Michaelson was properly admitted on the issue of materiality and to establish the authority of the Grand Jury in Kings County in inquiring into the stand-in arrest in New York County. (*People* v. *Peckens,* 153 N. Y. 576; *People* v. *Vario,* 165 Misc. 842; *People* v. *Malkin,* 250 N. Y. 185.) II. The phonograph recordings of the telephone conversations between Karp and Michaelson, and Gross and Michaelson were properly received in evidence. III. The conversation was admissible as a prior consistent statement. (*People* v. *Singer,* 300 N. Y. 120; *People* v. *Katz,* 209 N. Y. 311; *Di Carlo* v. *United States,* 6 F. 2d 364; *People* v. *Edwards,* 282 N. Y. 413; *People* v. *Jung Hing,* 212 N. Y. 393.) IV. The insinuations and innuendoes of appellant's counsel justify the receipt in evidence of the conversation. (*People* v. *Malkin,* 250 N. Y. 185; *People* v. *Carborano,* 301 N. Y. 39; *People* v. *Slover,* 232 N. Y. 264; *People* v. *Bilanchuk,* 280 App. Div. 180; *People* v. *Van Arsdale,* 264 App. Div. 300, 289 N. Y. 810.) V. The door to the introduction in evidence of the conversation was opened by appellant. (*Perkins* v. *Hayward,* 124 Ind. 449; *Slade* v. *Commonwealth,* 155 Va. 1099; *People* v. *Fay,* 270 App. Div. 261, 296 N. Y. 510; *People* v. *Schlessel,* 196 N. Y. 476; *People* v. *Flaherty,* 162 N. Y. 532.) VI. The

People had established a proper foundation for the introduction of the telephone recordings in evidence. (*Wightman* v. *Campbell*, 217 N. Y. 479; *People* v. *McCarthy*, 250 N. Y. 358.) VII. The sixteen written transcripts of the recordings were properly received in evidence as an aid to the court and jury. (*People* v. *Del Vermo*, 192 N. Y. 470.) VIII. It was not error to refuse to permit the witnesses Flath and Lehman to testify. (*Matter of McLaughlin* v. *Curtis-Quillen Co.*, 223 App. Div. 208.) IX. The testimony of Buchbinder was properly received. X. The complaint as to the remarks of the District Attorney's summation is not preserved for review in the Court of Appeals. (*People* v. *Pindar*, 210 N. Y. 191; *People* v. *Levine*, 297 N. Y. 144; *People* v. *Slover*, 232 N. Y. 264; *People* v. *Fielding*, 158 N. Y. 542; *People* v. *Taishoff*, 218 App. Div. 843.) XI. The failure of the court to charge the limited extent to which the jury could consider the wire-tap evidence and its charge on materialty were not error. (*People* v. *Fay*, 270 App. Div. 261; *Rhinelander* v. *Rhinelander*, 219 App. Div. 189, 245 N. Y. 510; *Fitzpatrick* v. *International Ry. Co.*, 252 N. Y. 127; *People* v. *Levinson*, 254 App. Div. 588.) XII. The indictment is not defective. (*People* v. *Willis*, 158 N. Y. 392; *People* v. *Clements*, 107 N. Y. 205; *People* v. *Lisandrelli*, 139 Misc. 129; *People* v. *Tillman*, 139 App. Div. 572, 201 N. Y. 598; *Wood* v. *People*, 59 N. Y. 117; *People* v. *Helmer*, 154 N. Y. 596; *People* v. *Williams*, 243 N. Y. 162; *People* v. *Willett*, 213 N. Y. 368; *People* v. *Meyer*, 123 Misc. 243.) XIII. The perjury related to a material matter. (*People* v. *Reiss*, 255 App. Div. 509, 280 N. Y. 539; *Buckin* v. *Long Island R. R. Co.*, 286 N. Y. 146; *Berner* v. *Board of Educ.*, 286 N. Y. 174; *Leonard* v. *Home Owners' Loan Corp.*, 297 N. Y. 103; *Wood* v. *People*, 59 N. Y. 117.) XIV. The foreman of the Grand Jury did not hear evidence outside the grand jury room so as to invalidate the indictment. (*People* v. *Sweeney*, 213 N. Y. 37; *People* v. *Glen*, 173 N. Y. 395; *Hope* v. *People*, 83 N. Y. 418.) XV. The wire-tap evidence was properly obtained. (Richardson on Evidence [7th ed.], p. 73; *People* v. *Richter's Jewelers*, 291 N. Y. 161; *People* v. *Doran*, 246 N. Y. 409; *People* v. *Defore*, 242 N. Y. 13.)

DYE, J. The defendant appeals by permission of an Associate Judge of this court (Code Crim. Pro., § 520, subd. 3) from the affirmance in the Appellate Division of a conviction of the crime of perjury in the first degree following a trial in the County Court of Kings County and a special jury. The indictment under which he was tried was returned under date of October 27, 1950, and amended February 19, 1951, by the 1949 Grand Jury of Kings County engaged to " ' investigate the alleged activities of criminals, racketeers and gamblers ' '', it having been extended to March 31, 1951.

The defendant was charged in two counts with (1) the crime of perjury, first degree, and (2) the crime of perjury, second degree — the first alleging perjury as to a material matter in that when called before the Grand Jury he did willfully and knowingly testify falsely that he did not see Arthur Karp on the 14th day of September, 1950, whereas in truth and in fact, he did see him on that day. This circumstance was deemed material in connection with an investigation the jury was then making to " determine whether any members of the Police Department of the City of New York had refused and neglected to arrest bookmakers and gamblers known to said members to be such bookmakers and gamblers and to be engaged in bookmaking and gambling, but in lieu thereof and for valuable consideration paid to them, had arrested other persons in place and stead of and as an accommodation for said bookmakers and gamblers ", that is, made so-called stand-in arrests and in particular, whether on September 14, 1950, the defendant Feld, then a member of the New York City Police Department performing duties as a plain-clothes man, refused to arrest one Arthur Karp, a known book-maker but had, in fact, for a money consideration and for the accommodation of said Karp, arrested one Irving Goldstein in his place and stead (Penal Law, § 1620-a). The second count was on the same averment of facts but omitted the allegation of materiality (Penal Law, § 1620-b).

It may be said at the outset that the record contains evidence which, if credited, is more than sufficient to sustain the verdict of guilt beyond a reasonable doubt. This is not seriously challenged by the appellant who contends in this court that a series

of evidentiary rulings were erroneous in law and as such prejudiced the defendant.

To show materiality of the alleged perjurious testimony, the People called *Raymon H. Chadeayne,* the foreman of the hold-over Grand Jury, who gave testimony concerning the nature and scope of the matters then under investigation. According to Chadeayne, when Feld, having signed a waiver of immunity, appeared before the Grand Jury and was asked '' Did you see Arthur Karp on September 14th? '' he answered '' No sir.'' To establish the falsity of such testimony the People called Arthur Karp. He was a known book-maker and gambler with a record of seven prior convictions and at the time was in the employ of Harry Gross as a runner on a commission basis, in the so-called Garment District of New York City. Karp testified that on September 14th, the defendant Feld, then a plain-clothes man, apprehended him at the freight elevator entrance at 270 West 39th Street, stating that he was under arrest and that he pleaded with the defendant not to do it. After some colloquy, defendant agreed to accept $350 in lieu of an arrest, which amount Karp handed over to him out of his '' payoff money '' for the day — that defendant then departed and returned about 3:30 P.M. the same day and, according to Karp, stated '' There is a new regime in town. You have got to take that pinch '' to which Karp replied: '' Maybe I can get somebody else to take the pinch. I got seven convictions. I gave you three fifty.'' An acrimonious discussion followed, the defendant Feld finally agreeing to give Karp until 4:30 P.M. to get a stand-in. During the interval, Karp — not knowing that the wire had been tapped — telephoned Murray Michaelson to advise him of the developments, following which it was arranged that Irving Goldstein would take the arrest. The details of the telephone conversation were not gone into at this point. The defendant returned as agreed, at 4:30 P.M., met Karp and Goldstein and in accordance with the arrangement, Goldstein was then taken into custody as a stand-in in place of Karp by a police officer named McConeghy, a teammate of Feld (plain-clothes men work in pairs) who was told by Feld '' take him away; everything is O.K.'' Such testimony was fully corroborated by Goldstein and two other witnesses.

The People called Murray Michaelson, the other party to the intercepted telephone conversation. He was a twice convicted book-maker and at the time was also employed by Harry Gross as manager of his central wire room located at Inwood Long Island. This witness testified, over objection, concerning the details as to the operation of the central wire room — that he was well acquainted with Karp and admitted, without going into details, that such a telephone conversation had taken place on the day in question — that while he was talking with Karp he was also connected by telephone with Harry Gross to whom he relayed the Karp conversation.

Both Karp and Michaelson were thoroughly cross-examined with a view to demonstrating that their testimony was in the nature of a recent fabrication, it being brought out that they each had a motive to testify falsely — Karp having admitted that he stood convicted on his plea of guilt, of the crime of conspiracy and bribery and was then awaiting sentence for that offense; that he was being allowed to attend to his regular business although in protective custody, and that on a prior occasion he had been physically beaten and that he freely admitted to a hope of leniency. Michaelson, in turn, admitted that he had been previously arrested as a material witness and held under a $50,000 bail and that after testifying before the Grand Jury he had been indicted and his bail then fixed at $2,500. During these respective cross-examinations, the wire-tapped conversations had on September 14th were extensively explored, notwithstanding that on direct examination the People had merely shown that a conversation had taken place, without developing the nature of it.

Because of the severe attack thus made on the credibility of their witnesses, Karp and Michaelson, the People then offered the recordings in evidence, the receipt of which was opposed on several grounds principal of which were illegality, lack of proper foundation and authenticity. All objections were quite properly overruled and the recordings received in evidence. The wire taps having been made pursuant to an order of the Kings County Court were valid (Code Crim. Pro., § 813-a) and not limited in scope to Kings County (Code Crim. Pro., § 39) for evidence so obtained may be used (*Matter of Harlem Check*

*Cashing Corp.* v. *Bell,* 296 N. Y. 15) and it does not violate the Federal Communications Act of 1934 (U. S. Code, tit. 47, § 605; *People* v. *Stemmer,* 298 N. Y. 728; *People* v. *Tieri,* 300 N. Y. 569). The favorable ruling on admissibility was on the theory that prior consistent statements are available to refute an imputation of recent fabrication, the door to which had been opened in this instance by defendant's attack on Karp and Michaelson, the parties to the intercepted conversation. Such ruling was in harmony with *People* v. *Singer* (300 N. Y. 120) and cases therein cited (see, also, 4 Wigmore on Evidence [3d ed.], p. 203).

The learned counsel for the appellant seeks to distinguish the applicability of such authorities by pointing out that Karp had not been offered immunity, was not an accomplice as a matter of law to the crime charged, and that not having been impeached or discredited on the ground of inconsistency, there was no need to corroborate this testimony as given by showing a prior consistent statement (*People* v. *Katz,* 209 N. Y. 311), particularly since he had freely admitted, prior to the making of the intercepted telephone conversation, to a circumstance indicating that he had a motive to falsify. This is based on his admission that there had been occasions when he had reported his expenses, including payments for protection, as being higher than he actually paid out, to justify which it is contended that a police officer's name would be needed — in this instance the name of Feld being used. This contention must be dealt with in the light of the whole cross-examination which had severely tested his credibility and from which the jury would have been justified in drawing an inference of recent fabrication, and that his testimony was a figment of his imagination, the accumulated effect of which was far more impressive than the usual impeachment of a witness " inherent in the differing versions " (*People* v. *Jung Hing,* 212 N. Y. 393, 403).

The authenticity of the recordings is also challenged in reliance on the circumstance that frequent pauses occur in the conversation and in particular a pause of about forty-five seconds during which the name of Feld is spoken. The appellant contends that this circumstance indicates a mutilation or perhaps a fabrication of the record as the word " Feld " occurring, as it does, during a long pause might well have been dubbed in.

In an attempt to demonstrate this, the appellant called a wire-tap expert to testify as to whether the condition indicated mutilation or the possibility of duplicate or substitute records, but his testimony proved abortive for when asked on direct examination whether, after looking at the record and examining it, he could tell if it was a duplicate or an original, his reply had been " No, sir, I could not " and at another point " Could you tell from that record and having heard it played, whether words had been inserted   *   *   *   or whether it was the original record? " he answered " I could not tell." Thereafter, on objection by the People, the witness was not allowed to state why he could not tell nor was he allowed to state his opinion as to what accounted for the pauses. Both rulings we deem unquestionably correct as the pauses had been accounted for by the circumstance that the recordings were of a three-way conversation — one between Karp and Michaelson and the other between Michaelson and Gross over another telephone, as to which Michaelson had testified without objection.

The appellant also brought out through chief inspector Flath that on September 15th, the records had been played back in the County Court Chambers, but was not allowed to show whether the inspector had heard the name " Feld " mentioned at that time, a ruling which we deem correct.

When the recordings were played back for the benefit of the trial jurors there was furnished to the court, counsel and each juror a mimeographed transcript of the recorded conversations (sixteen copies). These had been made by an official stenographer who testified that they were made from the original recordings and were accurate " word for word ". Before being admitted into evidence, the transcripts were compared by the court and the counsel not in the presence of the jury or members of the public. Nonetheless, the appellant objected to the receipt of such transcripts in evidence, not as to accuracy, but on the ground that the subject matter was secondary evidence, repetitious and prejudicial. There is nothing to the error so assigned. The recordings were the best evidence of the conversation, the transcript added nothing. To allow the court and jurors to hold in their hands a transcript as they listened to the playback of the records was no different than allowing them

to have, in an appropriate case, a photograph, a drawing, a map or a mechanical model, any of which have long been recognized as an assistance to understanding (*People* v. *Del Vermo,* 192 N. Y. 470; 2 Wharton on Criminal Evidence [11th ed.], p. 1274; 22 C. J. S., Criminal Law, p. 1201). Neither is there anything to the claim that by the use of such transcript, minutes of the testimony, otherwise unavailable, were improperly gotten into the hands of the jurors. There is no showing that they took such exhibits into the jury room or that they asked to do so. The case of *People* v. *King* (101 Cal. App. 2d 500), relied on by the appellant, stands for quite a different proposition. There the original tape recording had been intentionally destroyed and the court excluded an alleged copy (cf. *People* v. *Betts,* 272 App. Div. 737, affd. 297 N. Y. 1000).

The circumstance that the recorded conversations contained irrelevant, obscene and filthy matter does not prevent their use in evidence, particularly since the recordings were received subject to defendant's motion to strike out specific parts, which opportunity was not availed of by the appellant.

Other errors are claimed which are not available for review in this court for lack of appropriate objection (*People* v. *Levine,* 297 N. Y. 144; *People* v. *Minkowitz,* 220 N. Y. 399; *People* v. *Pindar,* 210 N. Y. 191; cf. *People* v. *Tassiello,* 300 N. Y. 425).

Appellant also urges two errors in respect to the court's charge in that (1) the court did not charge the jury that the wire-tap evidence was not admissible to prove or disprove whether Feld had lied before the jury, but was admissible only to supply corroboration to the testimony of Karp; and (2) that the court gave an incomplete definition of materiality. In both cases however defendant made no objection on this ground and no request to charge differently; this question is not therefore available on this appeal (Code Crim. Pro., § 420-a; *People* v. *Bester,* 297 N. Y. 408; *Fitzpatrick* v. *International Ry. Co.,* 252 N. Y. 127; *Rhinelander* v. *Rhinelander,* 219 App. Div. 189, 191, affd. 245 N. Y. 510).

The only other question raised by appellant relates to the indictment which he says is defective because the foreman of the Grand Jury heard the recordings of the intercepted telephone conversations outside the jury room. It is admitted that

Mr. Chadeayne was present in the County Court Chambers at the playback on September 15, 1950. We do not believe, however, that this affected a substantial right of the defendant to his prejudice. The Grand Jury was not in session. There is no proof in the record before us that the indictment was founded on anything but legal evidence properly before them (Code Crim. Pro., § 256). The Grand Jury, we must remember, had before it the testimony of Karp and Goldstein and that Feld himself had appeared and testified that he had not seen Arthur Karp on the 14th day of September, 1950. Furthermore, there is a presumption that an indictment is based on legal and sufficient evidence until the contrary is shown (*People* v. *Sweeney,* 213 N. Y. 37). Incidentally, it does not appear in the record that a motion was made on that ground for a mistrial or for instructions to the jury to disregard.

It is also noted that the defendant took the stand in his own behalf to deny that he saw Karp, the gambler, and Goldstein, the stand-in, at the time or under the circumstances shown by the People's witnesses, and to deny that the stand-in arrest described by them ever occurred, to corroborate which officer McConeghy, the defendant's plain-clothes teammate was called. The jury by their verdict obviously disbelieved them both.

Chief Judge LOUGHRAN, before his death, voted for affirmance of the judgment here appealed from.

The judgment should be affirmed.

FULD, J. (dissenting). I agree that the evidence adduced by the People, if credited, was sufficient to warrant a verdict of guilt, but that by no means ends our inquiry. We must still ascertain whether defendant had a fair trial, a trial free from prejudicial error.

I find it impossible to justify the series of rulings that prevented defendant from attempting to prove that the record of the intercepted conversation between Karp and Michaelson had been tampered with and his name " dubbed in." (See, e.g., *Dubois* v. *Baker,* 30 N. Y. 355; see, also, 7 Wigmore on Evidence [3d ed.], § 2027, p. 236.) That recording was, without a doubt, the most telling evidence against the accused. To jurors, " hearing " the conversation itself, it must have seemed

powerful confirmation of Karp's trial story. Indeed, were it not for that recording, the jury might well have accepted the testimony of defendant, a police officer who had enjoyed a good record for many years, rather than the say-so of convicted gamblers and confessed liars, men with a strong motive to testify falsely. And the prosecution must have appreciated this, for it went to great lengths to impress upon the jury the " physical " character of the wire tap. Obviously, then, the authenticity of the record was the critical issue upon the trial, and evidence reflecting upon its trustworthiness should not have been kept from the jury.

Although the conversation as recorded consumes some five minutes, Feld's name is mentioned but once, and on that lone occasion after a pause of forty-five seconds. In and of itself, that was a highly suspicious circumstance, but defendant did not choose to rely upon that alone. Urging that the record had been altered to include defendant's name, his attorney sought to establish that charge in two ways. In each instance, though, the attempt was completely frustrated by prosecution objections and court rulings.

Defendant first called a police inspector — Flath — and an official court stenographer — Lehman — who had heard a playback of the disc on September 15th, the day after the conversation had been intercepted. The trial judge, however, refused to allow the defense even to question those witnesses as to what they heard. And he persisted in his ruling, despite counsel's explicit statement that he was challenging " the authenticity of the record " and wanted to prove — through the testimony of the police inspector and by the shorthand notes of the court stenographer — that the name of Feld " was [not] mentioned in the record " when it was first played. If the inquiry had been permitted and the witnesses had testified that Feld's name was not on the record — or, its equivalent, that they did not hear his name when they listened to it (see *Latourelle* v. *New York Central R. R. Co.*, 301 N. Y. 103, 108; see, also, 2 Wigmore, *op. cit.*, § 664, p. 778) — it would mean that Karp had not mentioned Feld to Michaelson and that the record had been altered to include his name. The admission of such testimony would,

therefore, have had a tremendous impact upon the jurors; whether or not it would have prompted them to acquit, as I believe it unquestionably would, no one may say that the verdict was not influenced by its exclusion.

Thus prevented from trying to prove, more or less directly, that his name was not originally on the record, defendant called an expert witness in a further endeavor to show that the record had been tampered with. Again, his attempt to develop the point was thwarted by the court's rulings. After striking, as unresponsive, the expert's answer, " I found the record mutilated ", the trial judge refused to permit the witness to respond. to such questions as these, " Did you find evidence of mutilation in the record? " and " did you find any extreme lapse of time which would indicate something to a person who did wiretapping work? " As to the last query — the prosecution had advanced an explanation for the forty-five-second interval of silence that preceded mention of Feld's name, but that certainly should not, contrary to the court's suggestion (opinion, p. 331), foreclose defendant from seeking to prove, as a counterexplanation, that that " lapse of time " indicated a mutilation or an alteration of the record. Manifestly, if the prosecution's explanations are to be accepted without challenge, the elements of a fair trial are lacking. And to maintain that " the recordings were the best evidence of the conversation " (opinion, p. 331), overlooks the fact that the integrity of those recordings was the very issue to which the excluded testimony was addressed.

Proof that the record had been mutilated, proof that defendant's name had been " dubbed in," would not only have destroyed that " best evidence ", but would have gone far toward destroying the People's principal witness, and, in all likelihood, its entire case. The errors committed, therefore, "went to the very heart of the issue [and] compel reversal and a new trial." (*People* v. *Mleczko,* 298 N. Y. 153, 157.)

LOUGHRAN, Ch. J., LEWIS and FROESSEL, JJ., concur with DYE, J.; FULD, J., dissents and votes to reverse and order a new trial in opinion in which CONWAY and DESMOND, JJ., concur.

Judgment affirmed. [See 305 N. Y. 924.]