[Crim. No. 4863. Second Dist., Div. One. May 6, 1953.]

THE PEOPLE, Respondent, v. ARLIE STEPHENS, Appellant.

Ray L. Smith for Appellant.

Edmund G. Brown, Attorney General, and William E. James, Deputy Attorney General, for Respondent.

WHITE, P. J.—In an information filed by the district attorney of Los Angeles County, defendant was accused in count I of the crime of grand theft, and in count II of the crime of forgery.

Following the entry of a plea of not guilty to each count, the cause proceeded to trial before a jury, resulting in a verdict finding defendant guilty of the offense of forgery as charged in count II. As to count I, the jury was unable to agree upon a verdict, and the charge therein contained was subsequently dismissed.

Defendant's motion for a new trial as to count II was denied and he was sentenced to state prison for the term prescribed by law. Defendant appeals from the verdict, the judgment, and sentence, and from the order denying his motion for a new trial.

Count II of the information charged that defendant forged a certain bill of sale of an automobile and order in writing for the delivery of merchandise, with intent to defraud and cheat Alfred Johnson and his wife, Celestine Johnson.

Epitomizing the factual background surrounding this prosecution, the record reflects that defendant was a man 56 years of age, actively engaged as a real estate broker and notary public in the city of Los Angeles. Mr. and Mrs. Johnson had known defendant for a number of years, and the latter had handled many real estate and other business transactions for them. Following the separation of Mr. and Mrs. Johnson, defendant continued to handle the latter's business affairs. There was considerable testimony that the Johnsons were both alcoholics. While enroute to an eastern destination Mrs. Johnson died, on or about September 25, 1951.

The vehicle involved in the forgery accusation was a 1950 Chevrolet which was purchased during the marriage of Mr. and Mrs. Johnson. On or about September 21, 1951, Mrs. Johnson decided to sell the automobile and consulted with defendant. He in turn introduced her to one Eric Rabone, who had been a friend of defendant for some 10 years. Because Rabone was a milkman serving customers on a route he maintained, it was felt he might secure a purchaser for the vehicle from among his customers.

Mr. Rabone, called as a witness for the prosecution, testified that accompanied by defendant, Mrs. Johnson came to his home on September 22, 1951. That he had met her the preceding evening. That Mrs. Johnson told him she desired to sell the Chevrolet automobile for about $1,400 or $1,450. That upon that occasion she gave the witness the pink slip to the vehicle (this was the pink slip allegedly forged), and asked him to sell the vehicle. Rabone identified the pink slip at the trial (People's Ex. 1), and stated that it was in the same condition at that time as when he received it from Mrs. Johnson, and that it had the two signatures of the Johnsons on it when delivered to him. The vehicle remained at Rabone's house when defendant and Mrs. Johnson left. Mr. Rabone offered the car to some of his customers for $1,400, without success. He talked to Mrs. Johnson and she told him to deal with the defendant. On Tuesday, September 25, 1951, Rabone took the automobile to Perrino's Auto Sales in the city of Los Angeles, and then had a telephone conversation with defendant, telling the latter of an offer of $1,175, whereupon defendant told him to close the deal. After accepting the offer of $1,175, Rabone called defendant and asked him to come to the sales agency, with which request defendant complied. When they left Perrino's Auto Sales they had a check for $1,175 in payment for the automobile. The check was made payable to Rabone and the latter delivered the pink slip to the buyer. Defendant and Rabone then went to the bank where the latter cashed the check, and both of them drove to defendant's home where Rabone gave defendant the money and the latter then gave Rabone $50, as a commission for selling the vehicle. Later that day defendant went by airplane to Detroit to take delivery of a car he had purchased. Upon his return from Detroit about October 5, 1951, defendant found a card requesting him to call Police Officer Collins. He thereupon telephoned the officer, and ascertained from the latter than an inquiry was in progress with reference to the aforesaid automobile, which had been reported as stolen by Mr. Johnson. Defendant told the officer that he would send Rabone over to explain the transaction. Rabone contacted Police Sergeant Collins, gave him a statement as to the transaction and left the papers given him by defendant, at the police station.

Rabone further testified that defendant had advised him to tell the police that he, Rabone, had given Mrs. Johnson

$1,000 for the car, and also requested Rabone not to mention defendant's name, but to say that he, Rabone, had sold the car.

Police Officer Mason W. Collins testified to a telephone conversation with defendant on October 5, 1951, concerning the report of the theft of the aforesaid automobile; that defendant told him he had no knowledge whatsoever as to the vehicle; that he did not know where it was or who had gotten it from Mrs. Johnson. The officer also had a conversation on the telephone with defendant on October 6, 1951, saying, "Didn't that fellow contact you yet?" and then, "I don't know his name"; that defendant said he had found out that Mrs. Johnson had sold the car to some "fellow," who in turn had sold it to a used-car dealer. The defendant told the officer, the "fellow" had paid Mrs. Johnson $1,000 for the car, and that he had resold the car for $1,175. The officer further testified that defendant said he would try to find out where the used-car lot was. The officer further testified that on October 9th, he talked to the defendant, who said that he did not know the name of the used-car lot; that it was on 51st and Figueroa; that he did not know the name of the man who bought the car from Mrs. Johnson.

Frank J. Kowalski, an acquaintance of defendant and the Johnsons, testified defendant had made the statement that "he might as well get whatever he can before somebody else gets it."

Attorney Paul Taylor, who represented the Johnsons, testified he telephoned to defendant on September 25, 1951, advising the latter that Mrs. Johnson was dead, and a few days later he again called him asking him if he knew the whereabouts of the Johnson car, and the defendant said he did not.

In connection with the charge of forgery there was introduced into evidence a card admittedly signed by the defendant as an exemplar of the latter's handwriting. There was also introduced in evidence a document containing typewriting made by the typewriter in defendant's office, and a document containing pen and ink handwriting made by Mr. Johnson.

Donn E. Mire, employed by the Los Angeles Police Department, and who, it was stipulated, was an expert on matters of questioned documents, testified as to the signatures and typewriting. He testified that he examined the exemplar of Mr. Johnson's handwriting with the writing on the aforesaid pink slip, and that in the opinion of the witness, Mr. Johnson did not write the signature, Alfred W. Johnson, on the pink slip. It was the opinion of the expert that the signature

on the pink slip had been traced thereon. The witness testified that from an examination of the other documents which admittedly had the defendant's name on them, it was his best judgment that the person who wrote the foregoing documents *could* have written the name Alfred W. Johnson on the pink slip, and in his opinion "probably did." The expert witness further testified that he compared the signature of Celestine Johnson on People's Exhibit 3, with the signature on a check admittedly written by Mrs. Johnson, and determined that the name Celestine Johnson appearing on the bill of sale for the automobile was a tracing of her signature on the aforesaid check. The witness then compared the typewriting on the bill of sale with the typewriting on the paper which was taken from the typewriter in defendant's office, and expressed the opinion that the same typewriter made the impressions on both the sheet of paper and the bill of sale.

There was testimony that the bill of sale to the automobile was executed by Mr. and Mrs. Johnson in the presence of Constance Hunsicker whose name appears thereon as a witness. The latter denied she signed the document, but handwriting expert Donn Mire called by the prosecution, testified that in his opinion the signature of Celestine Johnson on the bill of sale, "was, in fact, written" by her. There was also testimony that Mr. Johnson had accepted $200 for his interest in the vehicle and signed a receipt therefor.

With reference to the pink slip, the expert witness Donn E. Mire testified, "It is my best judgment that the person who wrote Exhibits 11 and 12 (exemplars of defendant's handwriting) could have written the name 'Alfred W. Johnson' on People's Exhibit 1 (the pink slip) and he probably did"; that his opinion was a "qualified one." It is noteworthy that the expert witness had no exemplars of the handwriting of either Mr. Rabone or Mrs. Johnson.

Defendant did not take the witness stand in his own defense, but it is significant, as appears from the uncontradicted affidavit presented on the motion for a new trial that defendant was represented by an attorney recommended to him by Mr. Rabone, the principal, if not chief witness for the prosecution. That, "during all of the time the above case was on trial, the said Mr. Newton (attorney for defendant) was representing and handling affairs for the said Mr. Rabone." It was also before the court and uncontradicted on the hearing of the motion for a new trial, "That throughout said trial and on many occasions when conferring with said

attorney, affiant expressed the desire to take the witness stand and explain every matter that needed any explanation but in each instance, his said attorney advised him that he had nothing to worry about and that the Law only required him to show 'authority' to constitute a defense to the charge of forgery. That affiant's attorney was of the opinion that by introducing a Bill of Sale signed by Mr. and Mrs. Johnson take the witness stand."

that this constituted a defense and therefore affiant need not

As his first ground for reversal appellant asserts that the evidence is insufficient as a matter of law to sustain the conviction of forgery of the bill of sale to the automobile as charged in count II of the information.

The elements necessary to establish the claim of forgery (Pen. Code, § 470) are:

(1) signing the name of another;

(2) with intent to defraud; and

(3) without authority to do so.

In count II of the information appellant was specifically charged with forgery of the bill of sale to the automobile and the prosecution's own expert witness testified that in his opinion the signatures of both Mr. and Mrs. Johnson on the bill of sale were genuine and were written thereon by them.

As to the pink slip, the testimony of the prosecution's main witness, Mr. Rabone, was that the pink slip was delivered to him by Mrs. Johnson herself, and at the time he received it, had the signatures of both herself and her husband on it. Mrs. Johnson also delivered the vehicle to Mr. Rabone simultaneously with the delivery of the aforesaid pink slip. True, the prosecution's handwriting expert testified that in his opinion Mr. Johnson did not write his name on the pink slip, and that such signature had been traced thereon, but as to appellant having signed the name the expert's opinion was that the former "*could*" have written the name and "probably did." But the expert testified he could not give a "*definite*" opinion and that his opinion was a "*qualified*" one. It is also significant that from the time Mrs. Johnson gave the pink slip to Rabone with both signatures on it, there is no evidence showing appellant's possession of the document, nor even of his being present when the pink slip was also there.

It is true that Mr. Johnson, an admitted alcoholic, testified that he did not sign his name to the pink slip, but there was

positive evidence that he signed the bill of sale and received the sum of $200 for his interest in the automobile.

It is without conflict in the evidence that Mrs. Johnson gave Mr. Rabone the signed pink slip with the signatures of herself and her husband upon it. That Mrs. Johnson told Rabone to deal with appellant regarding the sale of the automobile. Rabone sold the vehicle to Perrino's Auto Sales with appellant's consent. It should be remembered that appellant was in possession of a bona fide bill of sale for the automobile, which document admittedly bore the genuine signatures of Mr. and Mrs. Johnson, owners of the vehicle. Manifestly, insofar as Mr. and Mrs. Johnson and appellant were concerned, this document invested the latter with authority to deal with the automobile as he desired. It is also noteworthy that Mr. Johnson did not report the automobile stolen until after the death of his wife.

In reviewing the record in the light of the Attorney General's claim that, ''There was ample evidence to connect the defendant with the forgery of the bill of sale and the related document, the pink slip to the vehicle in question,'' we are constantly met with the admitted fact that Mrs. Johnson desired to sell the automobile in question and delivered it, together with the pink slip, to the prosecution's main witness, Mr. Rabone. It is difficult to reconcile the conduct of Mrs. Johnson with a conclusion that appellant sought to defraud her and her husband. The latter's signature on the bill of sale was genuine according to the testimony of the prosecution's own expert witness, and its genuineness is further enhanced by the testimony that Mr. Johnson received $200 for his interest in the vehicle.

It is axiomatic, of course, that to appraise the weight of the evidence is the function of the jury, while ours is to appraise its legal value, but it is axiomatic as well that an appellate court may set aside the findings of the trial court when there is no substantial or credible evidence in the record to support them, or where the evidence relied upon by the prosecution is apparently so improbable or false as to be incredible, or where it so clearly and unquestionably preponderates against the verdict or decision as to convince this court that its rendition was the result of passion or prejudice upon the part of the triers of fact. When a case presents any of these features this court deals with it as a matter of law.

 Conceding that such a situation can only be presented on appeal in extreme cases, we are disposed to say that the instant case does not present the usual and ordinary situation where the evidence was in conflict as to the main or only issue, but on the contrary, tenders to us a case where the evidence relied upon by the prosecution to establish guilt seemingly falls short of that quantum of reasonableness and substantiality required to satisfy the reason and judgment of those bound to act conscientiously upon it as to the existence of guilt beyond a reasonable doubt and to a moral certainty.

We have dealt with the evidence in this rather exhaustive fashion because we are convinced that, in the light of claimed errors occurring at the trial, and which we shall proceed to review, it seems quite likely that a miscarriage of justice occurred in this case.

Appellant next complains of the admission into evidence of certain conversations had with him. Tape and wire recordings were made of these conversations, and re-recordings were made from these records. It was the re-recordings that were played back in court. The records covered three separate conversations: (1) from Rabone to appellant by telephone, from Officer Phelps' office in the police station; (2) conversation of appellant and Officer Phelps in the police station; and (3) conversation at the home of Rabone between him, his wife, appellant and one Georgetta Williams.

 It would appear to be the law that such recordings are admissible in evidence and that the best evidence rule is not applicable; that the recordings are more reliable and satisfactory evidence than testimony of conversations given from memory by those who overheard them (*People* v. *Porter,* 105 Cal.App.2d 324, 330, 331 [233 P.2d 102]). Be that as it may, we are impressed with the fact that to be admissible in evidence, the conversations as recorded, should be audible and intelligible. And if not, the witness who heard the conversations should be called to testify.

Much of the recorded conversations related to the grand theft count on which the jury disagreed, and which need not concern us on this appeal. It is conceded that as to the forgery charge now before us, appellant made no admissions against himself, but on the contrary stoutly denied committing any forgery. In ruling on an objection as to the admissibility of the recorded conversations the trial judge said, ". . . and I haven't heard anything yet that sounded like a confession from the defendant . . . "

That the conversations were not only inaudible but unintelligible is indicated by reference to the reporter's transcript wherein on many occasions the official reporter inserts the word "unintelligible." Apparently, the reporter recorded what she heard and could understand, but left out what she could not. How many different versions of "what was said" there were in the jury room is a matter of conjecture.

On one occasion, while the recordings were being played, a juror interrupted to inquire, "Did he say 'stole' or 'sold' the car?" to which the court replied: "You will have to get that from the record—I won't interpret."

Another unusual incident occurred during the playing back of the recordings when appellant's counsel stated, "Your Honor, I understand there seems to be copies of these transcriptions." Thereupon the following colloquy occurred:

"Mr. Veitch (Deputy District Attorney): There is a copy the District Attorney has, and he is going to keep it. It is a confidential record.

"Mr. Newton (appellant's counsel): I wonder if there is an extra copy?

"Mr. Veitch: No, sir; there is not.

"Mr. Newton: I believe there has been a copy supplied to the Court?

"The Court: Yes, I have a copy.

"Mr. Newton: I wonder if there could be a copy supplied to counsel for the defendant?

"Mr. Veitch: If you want one, you will have to make it; but if you will just sit still, we will have the daily record for you. I am not giving the District Attorney's papers to counsel. This happens to be the property of the District Attorney."

On a subsequent occasion defense counsel endeavored to obtain a copy of the recordings, complaining to the court that some of the records contained references to other transactions not material to the cause on trial. Counsel's apparent anxiety was that without a copy of the recordings he would be powerless to prevent incompetent, immaterial and prejudicial matters getting before the jury, but that with a copy similar to the one in the possession of the judge and district attorney he would be in a position to object to playing records that contained matters subject to objection. Counsel urged further that because of the unintelligibility of many of the recordings, "I am completely in the dark as to what was said in about fifty per cent of that record . . .". To which the District At-

torney replied, ''Now it is clear, it is true that in a considerable portion of this, it is more or less unintelligible—I think that is the correct word to use—and that is no part of any evidence in this case. . . .

''Now, I want to say to counsel here again, these copies that have been prepared for my use, one of which I have loaned to your Honor, are the private property of the District Attorney in connection with the investigation into this, *as well as other matters,* and they are not records of the court in any sense. I have furnished my copy to the Judge for his help as the matter went along, in the event of objections or demands or requests to reread, so as to have some idea what was said. But certainly these are not evidence in the case, for the reason that to get such records as this has required hours and hours of checking, and very careful electronic work by the District Attorney's experts and the police. Now, I am stating to the Court that it is the preference of the District Attorney that the papers that the District Attorney handed to the Court be not handed to the counsel for the defendant. If the Court cares to part with them, the District Attorney would request that the Court hand them back to the source from which they came.'' (Emphasis added.)

Finally, the trial judge, with reference to the copy of the recordings furnished him by the district attorney said: ''Well, notwithstanding the fact that I have it here, I don't rely upon it at all, because it isn't what has been transpiring here in court . . . I would just as soon hand back my report to the District Attorney right now, *because it is of no great help to me, because I wanted to confine myself to what would be evidence in the court. These things are not evidence.*'' (Emphasis added.)

With every opportunity to present witnesses who heard the recorded conversations, we find the jury listening to recordings that were in many instances inaudible and unintelligible. As heretofore pointed out, how many different and varied interpretations were placed upon what the recordings conveyed by the various jurors is a matter of pure conjecture.

In connection with the forgery charge and with reference to appellant's ability to write, there was presented on the motion for a new trial two photographs of his hands showing an apparent arthritic condition in his fingers on both hands. While there was an exemplar of appellant's handwriting introduced into evidence, and there was testimony that he

"did very well" when he wrote on the card, the district attorney encountered some difficulty himself in deciphering some of appellant's writing on the aforesaid exemplar, and the officer who fingerprinted appellant testified that he typed on the card, "Can't open hands for printing." When asked why he made that notation the officer testified, "His hands were in a position of this sort (indicating)."

"Q. Indicating a doubled-up position? A. Yes sir.

"Q. I see. A. It made it impossible to get a clear impression of his four fingers, which is mandatory on those cards."

Another officer, in identifying appellant's handwriting on a card, testified, "It is a little hard to decipher, all the letters in his handwriting." But no such difficulty is presented in deciphering the signatures claimed to have been forged by appellant. The last named officer further testified:

"Q. Did you notice whether the defendant had any difficulty in writing? A. I think he had a little trouble with his hand. He told me he had arthritis."

We deem it useless to pursue the discussion any further. The case is one wherein there is lacking that element of fairness essential to due process. The case against appellant is far from being so clear and convincing that in spite of the atmosphere which surrounded the trial, there was no miscarriage of justice.

When we speak of administering "justice" in criminal cases, under the American system of procedure, we mean something more than merely ascertaining whether an accused is or is not guilty.

"The right of an accused in a given case to a fair trial, conducted substantially according to law, is at the same time the right of all inhabitants of the country to protection against procedure which might at some time illegally deprive them of life or liberty. 'It is an essential part of justice that the question of guilt or innocence shall be determined by an orderly legal procedure, in which the substantial rights belonging to defendants shall be respected.' " (*People* v. *Wilson*, 23 Cal.App. 513, 524 [138 P. 971].)

· It is not for us to say whether we think that the accused is guilty, and nothing said here is to be taken as indicating any opinion on the question of his actual guilt. We do hold, however, that the conditions under which this trial was conducted, in view of the state of the evidence, may well have turned the scale in favor of the prosecution and resulted in a miscarriage of justice.

The attempted appeal from the verdict and sentence is dismissed. For the foregoing reasons, the judgment and the order denying defendant's motion for a new trial are and each is reversed, and the cause remanded for a new trial.

Doran, J., concurred.

A petition for a rehearing was denied May 19, 1953, and respondent's petition for a hearing by the Supreme Court was denied June 4, 1953.