109 So.2d 454 (1959)
236 La. 881
STATE of Louisiana
v.
Celestine MELERINE and James Licciardl.
No. 44317.
Supreme Court of Louisiana.
February 16, 1959.
Rehearing Denied March 23, 1959.
*456 F. Irvin Dymond, John P. Dowling, Russell J. Schonekas, George W. Reese, Jr., New Orleans, for defendants-appellants.
Jack P. F. Gremillion, Atty. Gen., M. E. Culligan, Asst. Atty. Gen., L. H. Perez, Dist. Atty., L. H. Perez, Jr., 2nd Asst. Dist. Atty, New Orleans, August A. Nobile, Jr., Chalmette, Sp. Counsel, for appellee.
HAMLIN, Justice.
The defendants, Celestine Melerine and James Licciardi, were charged by bill of information with malfeasance in office,[1] a *457 crime prohibited by LSA-R.S. 14:134. They were tried, found guilty, and sentenced to serve three months in the parish jail and pay a fine of $500, in default of payment thereof to serve sixty additional days in the parish jail. They have appealed to this Court, presenting for our consideration fourteen bills of exceptions.
Defendants filed a motion to recuse the district attorney, Leander H. Perez, averring that he had a personal interest in the matter adverse to that of the prosecution. Such personal interest is set forth as follows:
"1) That Leander H. Perez, District Attorney, had a personal interest, adverse to that of the prosecution herein.
"2) That he was a member of a law firm or partnership composed of said Leander H. Perez, Leander H. Perez, Jr., and Chalin O. Perez, engaged in the practice of law under the name of Leander H. Perez and Sons.
"3) That Leander H. Perez, Jr., a son and law partner of said Leander H. Perez, was an Assistant District Attorney for the Parish of St. Bernard; that the defendants and their adherents controlled the policy making actions of the Police Jury of the Parish of St. Bernard by one vote; that said police jury was composed of members of different factions, the Melerine-Licciardi faction being in the majority by one vote; that proceedings seeking the removal from office of said Celestine Melerine and James Licciardi had been instituted against them under the Nos. 6192 and 6193 of the docket of said court; that one of the grounds urged by plaintiff in said removal proceedings was identical to the charge in these proceedings; that, therefore, the outcome of the instant proceedings had a very important bearing upon said action for removal from office.
"4) That movers and Leander H. Perez belong to opposing political factions, and that the removal of movers from office would accrue to the political benefits as well as the financial benefits of said Leander H. Perez and members of his political faction.
"5) That when movers and their political faction came into power by obtaining a majority vote of the Police Jury of St. Bernard Parish, that body reduced the monthly salary of Leander H. Perez, Jr., from $200.00 per month to $62.50; that should movers be removed from office, such removal would create an opportunity for the restoration of the salary of Leander H. Perez, Jr., to the sum of $200.00 per month.
"6) That when movers came into power as aforesaid, said body ceased the payment of a salary of $225.00 per month to Miss Rose Church, secretary of said Leander H. Perez, Sr., causing said Perez to have to pay said secretary from another source; that the removal from office of movers would create an opportunity for the restoration of said salary to Miss Rose Church and would thus operate to the benefit of the said Leander H. Perez, Sr.

*458 "7) That when movers came into power as aforesaid, said body ceased the payment of a salary of $350.00 per month to Anthony Licciardi, an investigator for the District Attorney, thus necessitating the payment of said salary by the said Perez from another source; that the removal of movers from office would create an opportunity for the restoration of said salary by the police jury to said Anthony Licciardi.
"8) That when movers came into power as aforesaid, said body ceased the payment of a salary to Rudolph McBride, an Assistant District Attorney, thus necessitating the payment of said salary from another source by said Perez."
The district attorney denied the grounds set forth in the motion to recuse and prayed for its dismissal. Upon its dismissal defendants applied to this Court for writs, which were refused with the statement: "Applicants will have an adequate remedy in the event of conviction." Defendants reserved Bill of Exceptions No. 1 to the trial judge's overruling their motion to recuse the district attorney after the hearing of evidence.
The causes for recusation of a district attorney, as set forth in LSA-R.S. 15:310, are:
"(1) If said district attorney be related to the party accused or to the party injured within the fourth degree, or be his father-in-law, or his son-in-law, or his brother-in-law, or be the husband of the accused or of the party injured;
"(2) If said district attorney shall have been employed or consulted as attorney for the accused before his election or appointment as district attorney;
"(3) If said district attorney shall have a personal interest adverse to that of the prosecution."
The persons referred to in defendants' motion, supra, are not the parties accused. The evidence discussed in the trial judge's per curiam to the bill does not show that they have employed the district attorney as counsel or that they have asked that he intercede for them.
Leander H. Perez, Jr., Second Assistant District Attorney, testified that he, the district attorney, and Chalin O. Perez, were not engaged in the practice of law as a law firm or partnership.
There is no allegation or showing that the district attorney would have to personally pay any part of the monthly salaries of the persons referred to in defendants' motion. The interest that a third person might have in keeping his job or that he will not suffer a reduction in pay is a personal interest, but it cannot be classed as an interest adverse to the prosecution. To say that an officer of the court, elected by the people, has an interest adverse to the prosecution because third parties will profit if the accused are removed from their positions or offices is mere speculation.
Article IX, Sec. 7, Louisiana Constitution of 1921, LSA, provides for the filling of such offices as are herein involved by the appointing power during the removal proceedings. The district attorney is therefore disassociated with the offices insofar as the appointment of successors is concerned.
The State sets forth in its brief that the suits for removal referred to by the defendants were filed by the district attorney in his official capacity and in the discharge of a mandatory duty provided by Article IX, Secs. 1, 6 and 7, of the Louisiana Constitution of 1921, which requires a district attorney, without pecuniary or personal reward, to file removal suits against parochial or ward officers when requested in writing by twenty-five citizens and taxpayers, and that the record in these removal cases (referring to Perez v. Licciardi, 236 La. 236, 107 So.2d 455, *459 in which this Court acted upon an application for writs) show that more than the necessary amount of citizens and taxpayers requested the district attorney to institute the suits for removal. This is not contradicted.
We find no direct connection between the removal proceedings and the present prosecution. In Stanley v. Jones, 197 La. 627, 2 So.2d 45, 48, we stated:
"The next question requiring consideration is defendant's plea of prematurity, which is predicated on the contention that defendant has never been charged, placed on trial, or convicted in the criminal courts on any of the charges set out in the petition, a prerequisite for the institution of a suit for the removal from office. Defendant's brief does not contain any argument in support of the plea. For our own part, we do not find any merit in it."
The above statement means that removal proceedings and a criminal prosecution against the same defendants are not interdependent; the mere fact that the district attorney has filed suit for the removal of the defendants from office reflects no reason for recusing him in a criminal prosecution.
Defendants contend that the case of State v. Tate, 185 La. 1006, 171 So. 108, 112, has extended LSA-R.S. 15:310 so as to require recusation in cases where the district attorney has a personal interest in the conviction rather than a personal interest adverse to that of the prosecution.
In the Tate case, supra, the defendant urged as grounds for the recusation of the district attorney the fact that he had previously acted as counsel for various insurance companies in proceedings against the defendant for damages alleged to have resulted from the crime for which he was being prosecuted. In upholding the defendant's contention this Court stated:
"In conducting a criminal case the prosecuting attorney must be fair and impartial, and see that defendant is not deprived of any constitutional or statutory right, because he is a quasi judicial officer. 18 C.J., Sec. 42, pp. 1315, 1316.
"This rule, founded on justice and fair dealing, we think is intended not only to restrain the offer of illegal evidence or the violation of the orderly rules of procedure by prosecuting officers, but also to require their recusation in those cases in which their interest, directly or indirectly, may be such as to cause them to sacrifice impartial justice to personal advantage.
"The statutory requirement that the district attorney shall be recused where `he shall have a personal interest adverse to that of the prosecution' is broad enough to cover a case where he is of counsel in a civil action against the accused, based substantially on the same or on closely related facts."
The Tate case, supra, is not apposite. There the district attorney definitely had an interest adverse to the prosecution.
This Court, in State v. Henry, 200 La. 875, 9 So.2d 215, 217, interpreted Article 310 of the Code of Criminal Procedure, which is now incorporated in the Revised Statutes as R.S. 15:310, as follows:
"* * * A mere reading of the article will show that it means exactly what it says, i.e., that any district attorney (or assistant district attorney) who has, previous to his election or appointment, `been * * * consulted as attorney for the accused,' will be recused in the trial of the case. This clause does not say, nor can it be construed to mean, that the district attorney (or his assistant) will be recused because his employment was sought by someone on behalf of the accused prior to his election or appointment. It means that he will be recused if prior to his election or *460 appointment he was consulted professionally with respect to the rights or defenses of the accused. We can think of no reason, and none has been pointed out to us, why the meaning of this codal article should be extended further. The reason for this rule of law is that it prevents a district attorney (or his assistant) from taking advantage of an accused by being placed in the position of having available for use against the accused information forming a part of the privileged communications existing between an attorney and his client that was imparted to him prior to his election or appointment. The other states that have passed on this point are in accord with this view. * * *"
In the instant case, it is self-evident that the accused never employed nor requested the services of the district attorney.
Defendants further contend that this Court, under the provisions of LSA-R.S. 15:422(6), should take judicial notice of the political conditions prevailing in St. Bernard Parish prior to the trial and at the time of the trial, as well as at the present time. In support of this contention, they urge that it is a well-known fact that the Parish of St. Bernard is a political hot-bed, and that the district attorney herein has lost control of the Police Jury. It is argued that this being the case the district attorney had a political advantage at stake in connection with the trial of the defendants.
Political conditions exist at all times where there is a democratic form of government, but we do not believe that the conditions alleged herein are of the type which would justify our taking special judicial notice.
This Court has consistently held that a district attorney may not be recused nor recuse himself on any ground other than one of those prescribed by law, because such grounds for recusation are limitative. State v. Boasberg, 124 La. 289, 50 So. 162; State v. Bryan, 175 La. 422, 143 So. 362; State v. Bussa, 176 La. 87, 145 So. 276.
For the reasons hereinabove assigned, there is no merit in Bill of Exceptions No. 1.
Bill of Exceptions No. 2 was reserved to the trial judge's overruling defendants' objection to the testimony of George Humble, former Road District Superintendent for the St. Bernard Parish Police Jury who assisted the district attorney in securing evidence for the prosecution, as to a conversation between him and the defendants with respect to kick-backs on a contract let by the Police Jury. The pertinent testimony to which the objection was raised is as follows:
"Q. Do you recall the amount Mr. Lopez kicked back to you under that agreement? A. Yes, sir, it was $359.50.
"Q. What did you do with it? A. Took the $359.50, and I carried it to Jimmy Liccardi's bar in Mereauxville and told him I had the kick-back."
Counsel for the defendants contended that the conversation had been recorded and that the recording itself constituted the best evidence of what took place at the purported meeting.
The testimony of the witness was relative to the events made the basis of the instant charge independent of any recordings of conversations between any of the parties and himself.
Since recordings were introduced later in the case and played in open court, we do not find that the defendants were prejudiced or that there was a violation of the Best Evidence Rule. LSA-R.S. 15:436. Cf. Thompson v. State, Okl.Cr., 298 P.2d 464. A determination of whether any conflict existed between the testimony of Humble and the tape recordings was a matter for the trial judge's consideration.
*461 The witness was not testifying regarding the contents of the purported wire recordings, as was the situation in the case of State v. McMullan, 223 La. 629, 66 So.2d 574, cited by defendants. That case is not apposite. There the coroner testified that the defendant had made a verbal statement which had been tape recorded. Later, it was reduced to writing in question and answer form but had not been signed by the defendant. When the witness attempted to testify regarding its contents, counsel for the defense in that case objected on the ground that the statement itself was the best evidence. This objection was overruled. This Court held, however, that there was no prejudicial error in view of the fact that counsel for the defense later introduced the written statement in evidence.
Bill of Exceptions No. 2 is without merit.
Bill of Exceptions No. 3 was reserved when the trial judge overruled defendants' objection to his order not permitting the witness George Humble to answer a question propounded to him on cross-examination at the end of the following testimony with respect to having recorded his conversations with the defendants and other parties:
"Q. Mr. Humble, you stated at times during the conversation you reached in and pressed off the turn off button? A. Yes, sir.
"Q. How did you make up your mind when to do that? A. Whenever the conversation got to a point I didn't think concerned any kind of way a wrong-doing to turn over to the District Attorney and I didn't see any need in wasting a good wire.
"Q. In other words you used your own judgment as to just what portion of the conversation was to be recorded?
"By the Court:
"Q. That is not a fair question. Did you at any time stop that recording instrument when either one of the persons you were convinced had anything to say whatsoever in connection with the matter that brought you there? A. No sir." (At this point, the objection, supra, was made.)
On re-direct examination, the witness Humble answered, in detail, questions propounded to him relative to his turning off the recording apparatus, known as a Minifone. His testimony is as follows:
"Q. Mr. Humble, you testified under cross-examination you could put your hand if you had a button unbuttoned and could turn the Minifone off and on? A. Yes sir.
"Q. Now then so we can keep the record straight, let's go over the matter of the first recording with Lopez, December 14th, 1957 at Jimmy Licciardi's home. Did you turn that Minifone off for a single moment from the time Jack Lopez walked in? A. I did not.
"Q. Let's go to the next after that at Lopez's home. Did you at any time turn off that Minifone from the time you started talking to Lopez until the time you left his home? A. I did not sir.
"Q. Let's go on to December 23rd, that was at Lopez's factory, when you went and he gave you the $51.20 and if I remember correctly you said he had a little difficulty in getting the money is that the incident?
* * * * * *
"Q. Did you at any time from the time you met Lopez until the time you left do you recall ever turning it off? A. No sir, I didn't.
"Q. No sir. December 26th, when you met the defendant Melerine in the Police Jury Secretary's Office and gave him and counted off the $51.20 and the two $100.00 bills from another source, that was December 26th, did you at any time from the time you *462 reached there or began discussing or talking to Mr. Melerine until the time you left him, did you at any time turn off that Minifone? A. I did not sir.
"Q. Going to January 23rd, at the Road District Office, that is the time you will remember when Lopez gave you a cash kick-back of $359.50, did you at any time from the moment you started talking to Lopez, the time the man came in your office, until the time he walked out, did you at any time during that conversation turn the Minifone off at all? A. I did not sir.
"Q. I understand at the end you had gone with Lopez to his automobile, had you taken the conversation in the office and the conversation at the automobile? A. No sir, I didn't turn it off between the time, but we could see a fellow start to come into the office.
"Q. What fellow? A. Workers, and I found an excuse to go to the bathroom. I turned the machine off. I didn't know what length of them they would be in the office.
"Q. Was there any conversation between you and Lopez during the time you had turned it off? A. Not one bit.
"Q. Did you turn it on after the employee left and you went back to your conversation with Mr. Lopez? A. Yes sir, I did.
"Q. Did you at any time turn it off until you got through with your transaction with Mr. Lopez? A. No sir.
"Q. Now then did you have a separate conversation later on with Mr. Lopez in his automobile? A. Yes sir. The transaction of the giving to him of the check and me the money, $359.50, only Mr. Lopez and myself were in the Road District office, between the time that we, Mr. Lopez and myself left the office and entered his automobile I did have occasion to turn the machine off and turn it back on while we were in the automobile. While in the automobile the man was not turned off.
"Q. The other incident of January 23rd, between yourself and Melerine and Licciardi in the back of the bar room when you turned over to Melerine and Licciardi the $359.50, from the time you met Licciardi or Melerine and the time you left Licciardi's bar, did you turn off that Minifone at any time? A. No sir, I did not.
"Q. The transaction of February 12th, 1958, that involved the fictitious shells deal and you had a conversation with Lopez and picked up $288.00, that was up at Lopez's factory?
* * * * * *
"A. I had it on at the time. When I walked in the factory and I met him and he didn't have the amount of money to give, so we got in the pickup truck and drove back up the road to a fellow named Henry Williams' and Mr. Lopez got out and went inside and came back with the money.
"Q. When he got out your car and went inside, did you turn the Minifone off? A. Yes sir.
"Q. From the time Mr. Lopez got in the car was it on? A. Yes sir, I did.
"Q. Every bit of the conversation between you and Lopez was recorded on the Minifone that day? A. It certainly was.
"Q. You never turned it off? A. The only time I turned it off was while Mr. Lopez was in the store.
"Q. Just one more. I overlooked this. On this same day February 12th, did you turn or when you turned over the $288.00 to James Licciardi, did you have the Minifone on when you *463 walked into the Sewerage District office? A. Yes sir.
"Q. Did you at any time during that conversation in the Sewerage District office turn off the Minifone at any time? A. No."
The above conversation, attached to the instant bill of exceptions, conclusively reflects that Humble did not turn off the Minifone when he was recording conversations which form the basis of the instant charge.
The control of cross-examination resides within the sound discretion of the trial court;[2] there was no abuse in overruling the instant objection. State v. Sauls, 226 La. 694, 77 So.2d 8.
Bill of Exceptions No. 3 is without merit.
Bill of Exceptions No. 4 was reserved to the ruling of the trial judge admitting the introduction in evidence of alleged transcriptions of wire recordings involving the defendants and the actual recordings themselves. These transcriptions were identified as "State 12," December 14, 1957; "State 15," December 26, 1957; and "State 17," January 23, 1958. Counsel for the defendants urged that the transcriptions did not constitute the best evidence; that the authenticity and integrity of the recordings were not established; that the voices on the three recordings were not properly identified; that repeated playings were necessary for transcription; and that the last three and one-half pages of "State 15" were irrelevant and immaterial, being suggestive of a different offense.
There is error in counsel's assertion that the transcriptions present a question of best or secondary evidence. They are independent in nature and form a part of the evidence submitted on the trial of the case. Monroe v. United States, 98 U.S.App.D.C. 228, 234 F.2d 49, certiorari denied 352 U.S. 873, 77 S.Ct. 94, 1 L.Ed.2d 76; 352 U.S. 937, 77 S.Ct. 219, 1 L.Ed.2d 170; 355 U.S. 875, 78 S.Ct. 114, 2 L.Ed.2d 79.
The testimony attached to this bill, and the trial judge's per curiam, definitely establish the authenticity and integrity of the recordings. Prior to trial, and in furtherance of a stipulation, the defendants and their attorneys met with the district attorney, the court reporter and others. The trial judge in his per curiam states:
"At this meeting, the defendants and their attorneys, informed those present that they did not have an expert technician to inspect the recordings and the recording devices; that they did not have a stenographer, and, that they would be satisfied to accept the transcriptions made by Mr. Neyrey, the Court Reporter, as a compliance with their request for oyer.
"At this time several recordings were played in the presence of the defendants and their attorneys; that defendants and their attorneys left the place of meeting, with the understanding that they would receive copies of the transcriptions of the recordings made by Mr. Neyrey, the Court Reporter.
"Later, and before the trial of case No. 4632 on June 10, 1957, Mr. Neyrey, the Court Reporter, furnished Mr. Dowling and Mr. Dymond, attorneys for defendants, the District Attorney and the Court with copies of the transcriptions of the recordings, intended to be offered by the state in both cases Nos. 4632 and 4634.
"Having in mind the difficulties and delays inherent in an effort to have the Court Reporter, take down stenographically in the courtroom, on the *464 trial of these cases, the recorded conversations contained on the wire and tape recordings, and then later transcribe them, the Court permitted the Court Reporter's transcriptions made in advance of trial to be admitted in evidence, after he had identified same, and, after Mr. Humble had testified as to these conversations, independent of the tape recordings, and transcriptions, and after Humble had identified in the recordings the conversations, as well as what was said by them when the recordings were played in open court on the trial of the case.
"The Court also admitted in evidence, the wire recordings containing the recorded conversation, as well as the Minifone recording machine, after all had been properly identified as will appear from the testimony of the following witnesses: * * *"
We find, as did the trial judge, that the transcriptions and the recordings introduced during the course of trial were those made prior to trial to be used as evidence in the instant prosecution. This State has previously permitted the offering in evidence of similar recordings and transcriptions. State v. Alleman, 218 La. 821, 51 So.2d 83; Cf., State v. Dooley, 208 La. 203, 23 So.2d 46; State v. Di Vincenti, 225 La. 689, 73 So.2d 806. We, therefore, conclude that the evidence was properly admitted.
"Lt. Thoman equipped himself with a Minifon to aid in the investigation. Through this device numerous conversations he held with various appellants were recorded on wires. The spools upon which the recordings were made were turned over to Lt. Thoman's superiors in the Police Department. A number of recordings thus obtained were played for the jury over objections. We find no merit in any of these objections. Appellants contend, in the first place, that this evidence was inadmissible under the best evidence rule. They say that Lt. Thoman's testimony was the best evidence as to the conversations. But courts have consistently admitted such recordings in evidence. Schuyler v. United Air Lines, D.C.M.D.Pa., 94 F.Supp. 472, affirmed 3 Cir., 188 F.2d 968; Commonwealth v. Clark, 123 Pa.Super. 277, 187 A. 237; State v. Slater, 36 Wash.2d 357, 218 P.2d 329; cases cited in Annotation, 168 A.L.R. 927; Burgman v. United States, 88 U.S.App.D.C. 184, 188 F.2d 637, certiorari denied 342 U.S. 838, 72 S.Ct. 64, 96 L.Ed. 1347; Gillars v. United States, 87 U.S.App.D.C. 16, 27, 182 F.2d 962, 973; Cf. People v. Hayes, 21 Cal.App.2d 320, 71 P.2d 321. Their competency as evidence derives from their reliability as a means of arriving at the truth. Of course, there must be evidence introduced from which it can be inferred that the recordings are accurate. Lt. Thoman provided such evidence by testifying as to the operation of the recording device, his method of operating it, the accuracy of the recordings, and the identities of the persons speaking.
* * * * * *
"Appellants say the recordings were not admissible as corroborative of Thoman's primary evidence because the latter had not been impeached, * * * citing Goins v. United States, 4 Cir., 99 F.2d 147, 150. But we do not rest the admissibility of the recordings upon a theory they constitute corroborative evidence, as is sometimes done. We think, as above indicated, that they are admissible as independent evidence of what occurred." Monroe v. United States, 98 U.S.App.D.C. 228, 234 F.2d 49, 54. Cf., Irvine v. People, 347 U.S. 128, 74 S.Ct. 381, 98 L.Ed. 561; On Lee v. United States, 343 U.S. 747, 72 S.Ct. 967, 96 L.Ed. 1270.
There is no merit in counsel's contention that the voices on the recordings *465 were not properly identified. They were identified by the witness Humble and by the trial judge himself, who states in his per curiam:
"While it is true that some few portions of several recordings were inaudible, the Court had no trouble in following the recordings both as to the substance of the recorded conversation, as well as identifying the voices of the speakers."
The fact that some of the recordings in the instant case had to be played more than once by the Court Reporter before his transcription is of no consequence.
In Monroe v. United States, supra, it is stated:
"Appellants also argue that particlar recordings, because inaudible at times or incomplete, gave the jury only a part of what they purported to represent. They cite Hunter v. Hunter, 169 Pa.Super. 498, 83 A.2d 401; People v. Stephens, 117 Cal.App. 2d 653, 256 P.2d 1033; and Williams v. State, 39 Ala. 532. No all embracing rule on admissibility should flow from partial inaudibility or incompleteness. The Court of Appeals for the Third Circuit, in United States v. Schanerman, 150 F.2d 941, 944, has said that partial inaudibility is no more valid reason for excluding recorded conversations than the failure of a personal witness to overhear all of a conversation should exclude his testimony as to those parts he did hear. Unless the unintelligible portions are so substantial as to render the recording as a whole untrustworthy the recording is admissible, and the decision should be left to the sound discretion of the trial judge. This is especially so when the witness who heard the statements recorded also testifies, so that the recordings give independent support to his testimony. Wright v. State [38 Ala. App. 64] 79 So.2d 66; * * *."
This case was not tried by a jury, and the fact that the last three and one-half pages of "State 15" were disassociated with the present charge caused no prejudice to the accused. The per curiam of the trial judge conclusively states that he was not influenced by the transcription or recording of the matter complained of. Counsel for the defendants have showed us no injury suffered by the defendants justifying the setting aside of the conviction. State v. Cascio, 219 La. 819, 54 So. 2d 95; State v. Shoemake, 143 La. 65, 78 So. 240.
For the detailed reasons above assigned, we conclude that there is no merit in Bill of Exceptions No. 4.
Bill of Exceptions No. 5 was reserved when the trial judge, over the objection of counsel for the defendants, allowed the playing of "State 12" while the State witness Humble was on the witness stand for the purpose of identifying voices on the recording. Grounds for this bill were the same as those set forth in Bill of Exceptions No. 4.
For the reasons set forth in our discussion of Bill of Exceptions No. 4, supra, there is no merit in this bill.
Bill of Exceptions No. 6 was reserved to the trial judge's overruling defendants' objection to the introduction in evidence of additional pages of "State 12," which had not been transcribed from the recordings prior to trial, and to the playing of the entire recording in open court. It was contended that there had been insufficient identification of the parties alleged to have been speaking in the transcription; that a sufficient predicate had not been laid for the introduction; that the transcription did not constitute the best evidence; that the transcription of the recordings contained references to the possible commission of other crimes not charged in the instant prosecution; and that the deletion of the additional portion of "State 12" would in no way destroy the continuity nor defeat *466 the purpose of the introduction of whatever part of "State 12" might be admissible.
The events leading up to the reservation of Bill of Exceptions No. 6 were, as stated in the trial judge's per curiam, that while George Humble was on the witness stand for the second time the district attorney informed the court that the reporter had not completed the entire transcription of the December 14, 1957 recording, and that there were a few more minutes thereon of the conversation between George Humble and the two defendants; the court adjourned to its chambers with counsel, thereupon learning that the untranscribed recording pertained to another transaction; the court reporter transcribed the untranscribed portion of the recording, except about three minutes of conversation, during the court's recess; the district attorney offered to have the untranscribed part of the recording played in open court, but the defendants did not accept the offer; the court then allowed the additional pages to be offered in evidence and the playing of that portion of the wire recording from which they were transcribed.
We do not find that the defendants were prejudiced by the events detailed above, nor do we find that the trial judge committed reversible error. He was called upon to exercise his discretion, and we see no abuse thereof. In his per curiam, he gives the following explanation of what transpired:
"George Humble, recalled to the witness stand, identified the voices appearing on the additional recording as those of himself, Licciardi, and Melerine. He further identified the utterances of each person speaking, as they were inquired of by the District Attorney.
"The additional recording contained some conversation as to shells and the twenty-five cents per yard `kick-back,' as well as the use by named persons to receipt for fictitious yardage. References are also made to the manner of setting up `kick-backs' and the handling of same by Humble for the account of Licciardi and Melerine, etc.
"It is respectfully submitted that this additional recording was admissible for the reasons set forth in Bill of Exception No. 4."
Bill of Exceptions No. 6 is without substance.
Bill of Exceptions No. 7 was reserved when the trial judge permitted the recording of "State 15" to be played through an amplifier and loud speaker while George Humble was on the stand the second time. Objections of counsel for the defendants were the same as those raised in Bill of Exceptions No. 4.
We find no merit to this bill, for the same reasons as those set forth in our discussion of Bill of Exceptions No. 4, supra.
Bill of Exceptions No. 8 was taken to the ruling of the trial judge permitting the introduction in evidence of "State 12", "State 15", and "State 17".
The testimony attached to Bills of Exceptions Nos. 4 and 8, and the trial judge's per curiam to Bill of Exceptions No. 4, set forth in detail the facts that the witness Humble recorded through a Minifone conversations he had with the defendants and others; August A. Nobile, Jr. re-recorded the wire recordings of the Minifone on an Ampro tape recorder, and they were transcribed by Charles A. Neyrey, Court Reporter; the recordings made by Humble were not handled, being kept safe in a bank box.
The transcriptions were independent evidence. Monroe v. United States, 98 U.S.App.D.C. 228, 234 F.2d 49, supra. Defendants contend that they were made in answer to their prayer for oyer, but the testimony shows that they were part of the stipulation discussed, supra. Since they constitute independent evidence, their admission did not violate the Best Evidence Rule, *467 LSA-R.S. 15:436; there was no violation of the Hearsay Rule, LSA-R.S. 15:434, because the method of procuration, supra, is now permitted by the courts of this State, as well as those of many other jurisdictions. (Authorities cited supra.)
We find no merit in Bill of Exceptions No. 8.
Bill of Exceptions No. 9 was reserved when the trial judge permitted the introduction in evidence of the original wire recordings from which "State 12", "State 15", and "State 17", were transcribed.
For the same reasons set forth in our discussions of Bills of Exceptions Nos. 4 and 8, supra, there is no substance to Bill of Exceptions No. 9.
After the State rested its case, defendants moved the trial court for a directed verdict of acquittal on the ground that the defendants were charged with malfeasance in office, in that they performed the duties of their office in an unlawful manner, and that since there had been no evidence presented showing that the acts committed by the defendants were in violation of any law of Louisiana, there was no performance of duty in an unlawful manner. Upon denial of this motion, Bill of Exceptions No. 10 was reserved.
LSA-R.S. 15:402.1 provides:
"In any criminal prosecution or proceeding in any court, triable by the court alone, the court on motion of a defendant or of its own motion shall order the entry of judgment of acquittal of one or more offenses charged in the indictment, information or affidavit after the evidence on either side is closed, if the evidence is insufficient to sustain a conviction of such offense or offenses. If a defendant's motion for a directed verdict at the close of the evidence offered by the prosecution is not granted, the defendant may offer evidence without having reserved the right. The judgment of the court in refusing to grant such motion by the defendant shall not be subject to review by any appellate court." (Italics ours.)
In the case of State of Louisiana v. Crovetto, 229 La. 793, 86 So.2d 907, 908, certiorari denied 352 U.S. 833, 77 S.Ct. 50, 1 L.Ed.2d 53, we interpreted the above statute as follows:
"* * * The refusal to grant a directed verdict is something that we cannot review. Article 402.1 of the Code of Criminal Procedure, R.S. 15:402.1, which gives the accused in a criminal prosecution the right to move for a directed verdict after the evidence on either side is closed, also provides that `The judgment of the court in refusing to grant such motion by the defendant shall not be subject to review by any appellate court'."
See, also, State v. Domino, 234 La. 950, 102 So.2d 227.
In view of the above law and jurisprudence, the merits of Bill of Exceptions No. 10 are not subject to review.
Bills of Exceptions Nos. 11, 12, and 13, were reserved to the refusal of the trial judge to charge himself as follows:
Special Charge No. 1
"The defendants are charged under R.S. 14:134 with malfeasance in office in that they did wilfully and intentionally perform duties of their offices in an unlawful manner.
"In order to support a conviction under this charge one of the necessary elements of proof is proof beyond a reasonable doubt that the duty or duties alleged to have been intentionally performed in an unlawful manner were duties either imposed upon them by departmental rules or rules of the Police Jury of St. Bernard.
"In other words, proof of the performing in an intentionally unlawful manner of an abstract duty will not suffice,

*468 it being required that there be shown the existence of a specific statute imposing such duty or a specific rule or regulation of the department or political body of which the defendants are public officers or public employees."
Special Charge No. 2
"The defendants are charged under R.S. 14:134 with malfeasance in office in that they did wilfully and intentionally perform duties of their offices in an unlawful manner.
"One of the necessary elements of the offense charged is that a duty lawfully required of a defendant be performed in an unlawful manner.
"The question is now presented as to what is meant by the performance of a duty in an unlawful manner. In order to perform a duty in an unlawful manner such duty must be performed in violation of a particular or specific statute or law. In other words should the specific actions taken by the defendants in the performance of a duty not in itself constitute a crime, even though such action be reprehensible and contrary to what would and should be expected of a public officer or public employee, such would not constitute a violation of R.S. 14:134, even though such action might amount to an intentional abuse of discretion by the public officer or public employee."
Special Charge No. 3
"R.S. 14:134 does not make the intentional abuse and misuse of discretion conduct prohibited and penalized by that statute. A judicial decision to the effect that any intentional abuse or misuse of official discretion would per se constitute malfeasance in office would so broaden the scope of the statute and so vest the Court with the power to be arbitrary, capricious and inconsistent in its interpretation of the statute as to deprive the defendants of a fair trial, due process of law and equal protection of law in violation of the 14th Amendment of the United States Constitution and in violation of the provisions of the State of Louisiana Constitution."
The trial judge properly summarizes the above contentions as follows:
"1. * * * the duty must have been imposed upon defendants by departmental rules or rules of the Police Jury of the Parish of St. Bernard; that an abstract duty will not suffice, to bring defendants within the statute.
"2. * * * to bring defendants within the statute the duty must be performed in violation of a specific statute or law; that the conduct of defendants complained of must constitute a crime; that such conduct, no matter how reprehensible would not suffice.
"3. * * * L.S.A.-R.S. 14:134 does not prohibit or penalize the intentional abuse and misuse of discretion."
Article XIX, Section 1, Louisiana Constitution of 1921, provides that
"all officers before entering upon the duties of their respective offices * * shall take the following oath or affirmation;
"`I, (A. B.) do solemnly swear (or affirm) that I will support the Constitution and laws of the United States and the Constitution and laws of this State; and that I will faithfully and impartially discharge and perform all the duties incumbent upon me as .........., according to the best of my ability and understanding. So help me God.'"
LSA-R.S. 14:2 states:
"`Public officer,' `public office,' `public employee' or `position of public authority' means and applies to any executive, ministerial, administrative, judicial, or legislative officer, office, employee or position of authority respectively, of the State of Louisiana or any parish, municipality, district, or other *469 political subdivision thereof, or of any agency, board, commission, department or institution of said state, parish, municipality, district or other political subdivision."
In the case of State ex rel. Porterie v. Smith, 184 La. 263, 166 So. 72, 76, we said:
"That a police juror is a `public officer' and a `state officer' is well settled by the jurisprudence of this court, by the provisions of the State Constitution, and by various statutes passed by the Legislature, and its members are presumed to know that fact.
* * * * * *
"As there are only three general departments of government, police juries must be classified as being in the executive department of government. Saint v. Allen, 169 La. 1046, 1066, 126 So. 548.
"`A police jury is not a legislative body, and its members are not legislators.' They are `officers of a political corporation.' State ex rel. Gorham v. Montgomery, 25 La.Ann. 138.
"Police juries are political corporations whose powers are specially defined by the Legislature, and they can legally exercise no other power than those delegated to them. * * *
"Police juries execute or enforce the limited police powers delegated to them by the Legislature through the passage of local ordinances and resolutions, and, in doing so, they exercise only administrative powers." See, also, Stone v. Police Jury of Parish of Calcasieu, 226 La. 943, 77 So.2d 544.
From the foregoing, we conclude as did the trial judge that a police juror is a "State Officer" and a "Public Officer," his pay being provided for in LSA-R.S. 33:1233.
Among the powers which a police jury has, LSA-R.S. 33:1236 enumerates the following:
"(2) To regulate the proportion and direction, the making and repairing, of the roads, bridges, causeways, dikes, dams, levees, and highways, and when, in the opinion of the police jury, such work will further the best interests of the parish and the parish road system, the police jury may perform all or any part of the repair, maintenance and care of roads, streets, alleys, bridges, and culverts, situated within and under the jurisdiction of any municipality, with less than five thousand inhabitants, in the parish."
The oyster shells which the St. Bernard Parish Police Jury contracted to buy from John B. Lopez were construction materials; the above statute empowered it to enter into a contract for such purchase. It follows that in exercising such power, defendant Celestine Melerine, as President, and defendant James Licciardi, as Vice-President, had a mandatory duty to conform to the standards of conduct required by their oath of office, supra.
LSA-R.S. 14:134 prescribes that malfeasance in office shall be committed by any public officer or public employee when he shall:
"(1) Intentionally refuse or fail to perform any duty lawfully required of him, as such officer or employee; or
"(2) Intentionally perform any such duty in an unlawful manner; or
"(3) Knowingly permit any other public officer or public employee, under his authority, to intentionally refuse or fail to perform any duty lawfully required of him, or to perform any such duty in an unlawful manner."
We conclude that the bill of information, which sets forth that the defendants"intentionally and unlawfully negotiated and contracted with John B. Lopez to sell steamed oyster shells to the St. Bernard Parish Police Jury with the understanding and agreement that the said Lopez would kick-back or pay 25¢ per yard *470 of said shells sold by him to said Police Jury to George Humble,[3] said Police Jury employee as said Melerine's and Licciardi's intermediary or agent, and for account and benefit of the said Melerine and Licciardi, and in accordance with said unlawful agreement the said Lopez remitted said kick-back or payments to the said Humble for account of said Melerine and Licciardi, and the said Humble delivered said kick-backs to the said Melerine and Licciardi," charges the defendants with the intentional performance of their duties in an unlawful manner, in violation of LSA-R.S. 14:134.
The trial judge in his per curiam states:
"Finally it will be seen from the facts disclosed on the trial, that the `kick-backs' arranged for by Melerine and Licciardi through their intermediary Humble, were nothing more or less than bribes * * *
"As the evidence disclosed, the St. Bernard Parish Police Jury advertised for bids for `steamed oyster shells' without specifying the amount. Later the Police Jury took Lopez's bid of $1.65 a yard under advisement. Still later the bid of Lopez of $1.65 per yard was accepted, and Celestine Melerine, the president, was authorized to contract with Lopez for the sale and delivery of `steamed oyster shells' of an unspecified amount at the rate of $1.65 a yard.
"However, Lopez had been told by Humble acting for Melerine and Licciardi, he would only receive $1.40 a yard for his shells, and would have to `kick-back' to Melerine and Licciardi through Humble, 25 cents a yard. This was paid for each yard delivered."
For the reasons above assigned, we find, as did the trial judge, that the requested special charges were argumentative, abstract, and not wholly correct and wholly pertinent; they required qualification, limitation, and explanation.
Finally, as required by LSA-R.S. 15:391 and 393, defendants did not accompany Bills of Exceptions Nos. 11, 12, and 13, with a statement of facts showing the error in the charge given or in the refusal to charge as requested. Even though we have passed upon the correctness of the requested chargesfinding them not wholly correct, the omission of the statement of facts would deprive appellants of our review of these bills.
We, therefore, conclude that Bills of Exceptions Nos. 11, 12, and 13, are without merit.
Bill of Exceptions No. 14 was taken to the trial judge's overruling defendants' motion for a new trial. Nothing new is presented for our review, the motion is based on the assigned errors of the thirteen aforediscussed bills. State v. Smith, 234 La. 19, 99 So.2d 8. There is no merit to this bill.
For the reasons assigned, the conviction and sentence are affirmed.
SIMON, Justice (dissenting).
I respectfully submit that the majority ruling holding that Bill of Exception No. 3 is without merit is contrary to and in direct conflict with R.S. 15:450, the text of which is as follows:
"Every confession, admission or declaration sought to be used against any one must be used in its entirety, so that the person to be affected thereby may have the benefit of any exculpation or explanation that the whole statement may afford."
In connection with the testimony of the state witness Humble, an investigator for the district attorney's office, employed for the purpose of secretly obtaining recorded admissions and statements from the defendants *471 through the use of a Minifone, a wire recording device, which recorded statements and admissions were offered in evidence over objection, it appears that this witness admitted on cross-examination that such admissions and statements of the defendants were not taken in their entirety; that at times when he thought the admissions or statements were not pertinent or relevant to a criminal offense he would "cut off" the recording instrument for the reason that he "didn't see any need in wasting a good wire". In other words, he arrogated to himself the right of determining from the admissions and statements of the defendants what was culpable and what was not. This, in the words of the statute, supra, deprived the defendants of the benefit of any exculpation or explanation that the whole statements may have afforded in the light of guilt or innocence.
NOTES
[1] "* * * while Celestine Melerine was serving as a duly elected and qualified member and as President of the St. Bernard Parish Police Jury and while James Licciardi was serving as a duly elected and qualified Member and as Vice-President of said Police Jury, the said Melerine and Licciardi wilfully and intentionally performed duties of their said offices in an unlawful manner, the said Melerine and Licciardi intentionally and unlawfully negotiated and contracted with John B. Lopez to sell steamed oyster shells to the St. Bernard Parish Police Jury with the understanding and agreement that the said Lopez would kick-back or pay 25¢ per yard of said shells sold by him to said Police Jury to George Humble, said Police Jury employee as said Melerine's and Licciardi's intermediary or agent, and for account and benefit of the said Melerine and Licciardi, and in accordance with said unlawful agreement the said Lopez remitted said kick-back or payments to the said Humble for account of said Melerine and Licciardi, and the said Humble delivered said kick-backs to the said Melerine and Licciardi, * * *"
[2] "In the discipline of his court the trial judge is vested with a sound discretion to stop the prolonged, unnecessary and irrelevant examination of a witness, whether such examination be direct or cross, and even though no objection be urged by counsel." LSA-R.S. 15:369.
[3] Humble wanted to quit his job but was induced by his superior to remain in his position in order to secure the evidence for the instant prosecution.